AVERY *v.* GEORGIA.

No. 648.   Argued April 30, 1953.—Decided May 25, 1953.

*Frank M. Gleason* argued the cause and filed a brief for petitioner.

*M. H. Blackshear, Jr.,* Deputy Assistant Attorney General of Georgia, argued the cause for respondent.   With

560

him on the brief were *Eugene Cook,* Attorney General, *Lamar W. Sizemore,* Assistant Attorney General, and *Paul Webb.*

Mr. Chief Justice Vinson delivered the opinion of the Court.

Petitioner was tried for rape in the Superior Court of Fulton County, Georgia. He was convicted and sentenced to death. The Supreme Court of Georgia affirmed after overruling petitioner's contention that the jury which convicted him had been selected by a means repugnant to the Equal Protection Clause of the Fourteenth Amendment.[1] We granted certiorari to review this claim. 345 U. S. 903.

The indictment, upon which petitioner was tried, was returned by a grand jury in Walker County, Georgia. A change of venue was granted and the cause removed to Fulton County. By proper pleadings petitioner, a Negro, challenged the array of petit jurors selected to try his case; he charged that discrimination had been practiced against members of his race. Testimony was then taken, and thereafter the trial court overruled the challenge.

The salient facts, developed in this hearing, are undisputed. Under Georgia law the task of organizing panels of petit jurors for criminal cases falls upon a county Board of Jury Commissioners. In discharging this responsibility the Commissioners, at stated intervals, select prospective jurors from the county tax returns. Their list is then printed; the names of white persons on this list are printed on white tickets; the names of Negroes are printed on yellow tickets. These tickets—white and yellow—are placed in a jury box. A judge of the Su-

---

[1] *Avery* v. *State,* 209 Ga. 116, 70 S. E. 2d 716 (1952).

perior Court then draws a number of tickets from the box. The tickets are handed to a sheriff who in turn entrusts them to a clerk. It is the clerk's duty to "arrange" the tickets and to type up, in final form, the list of persons to be called to serve on the panel.

Approximately sixty persons were selected to make up the panel from which the jury in this particular case was drawn. The judge who picked out the tickets—bearing the names of persons composing the panel—testified that he did not, nor had he ever, practiced discrimination in any way, in the discharge of that duty. There is no contradictory evidence. Yet the fact remains that there was not a single Negro in that panel. The State concedes that Negroes are available for jury service in Fulton County, and we are told that Negroes generally do serve on juries in the courts of that county. The question we must decide, based upon our independent analysis of the record,[2] is whether petitioner has made a sufficient showing of discrimination in the organization of this particular panel. We think he has.

The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure—"a course of conduct"—which would not "operate to discriminate in the selection of jurors on racial grounds." *Hill* v. *Texas*, 316 U. S. 400, 404 (1942). If they failed in that duty, then this conviction must be reversed—no matter how strong the evidence of petitioner's guilt. That is the law established by decisions of this Court spanning more than seventy years of interpretation of the meaning of "equal protection."[3]

---

[2] *Norris* v. *Alabama*, 294 U. S. 587 (1935).

[3] *E. g., Neal* v. *Delaware*, 103 U. S. 370 (1881); *Rogers* v. *Alabama*, 192 U. S. 226 (1904); *Norris* v. *Alabama, supra; Pierre* v. *Louisiana*, 306 U. S. 354 (1939); *Cassell* v. *Texas*, 339 U. S. 282 (1950).

Petitioner's charge of discrimination in the jury selection in this case springs from the Jury Commissioners' use of white and yellow tickets. Obviously that practice makes it easier for those to discriminate who are of a mind to discriminate. Further, the practice has no authorization in the Georgia statutes—which simply enjoin the Commissioners to select "upright and intelligent men to serve as jurors . . . ." [4] It is important to note that the Supreme Court of Georgia, in this case, specifically disapproved of the use of separately colored tickets in Fulton County, saying that it constituted "prima facie evidence of discrimination."

We agree. Even if the white and yellow tickets were drawn from the jury box without discrimination, opportunity was available to resort to it at other stages in the selection process. And, in view of the case before us, where not a single Negro was selected to serve on a panel of sixty—though many were available—we think that petitioner has certainly established a prima facie case of discrimination.

The court below affirmed, however, because petitioner had failed to prove some particular act of discrimination by some particular officer responsible for the selection of the jury; and the State now argues that it is petitioner's burden to fill this "factual vacuum." We cannot agree. If there is a "vacuum" it is one which the State must fill, by moving in with sufficient evidence to dispel the prima facie case of discrimination. We have held before,[5] and the Georgia Supreme Court, itself, recently followed these

---

[4] Ga. Code Ann. § 59–106. See *Crumb* v. *State,* 205 Ga. 547, 54 S. E. 2d 639 (1949).

[5] *Norris* v. *Alabama, supra,* 294 U. S., at 594–595, 598; *Hill* v. *Texas,* 316 U. S. 400, 405–406 (1942) ; *Patton* v. *Mississippi,* 332 U. S. 463 (1947).

decisions,[6] that when a prima facie case of discrimination is presented, the burden falls, forthwith, upon the State to overcome it. The State failed to meet this test.

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE REED, concurring.

I concur in the reversal. My concurrence is based on the undisputed facts presented by the record. The facts that make a prima facie case of discrimination in the selection of petitioner's jury are as follows. The population of Fulton County is 691,797. Negroes comprise 25% or 165,814. The tax receiver's digest from which the jury list is selected has 105,035 white citizens and 17,736 Negroes—14%. The jury list for the year in question had 20,509 white and 1,115 Negroes—5%. From that list a number, 150 to 200, were drawn for service on each of the divisions of the court. Evidently these were for a week or a term's service. The venire from which the trial jury for Avery was selected numbered 60. All were white.

These facts establish a prima facie case of discrimination which the record does not rebut.

MR. JUSTICE FRANKFURTER, concurring.

It is undisputed that the drawings here were made from a box containing white and colored slips differentiated according to racial lines, white for white veniremen and yellow for colored. The slips were indiscriminately

---

[6] *Crumb* v. *State, supra.*

placed in the box and were drawn from the box by a county court judge. There was testimony from a recent member of the county Board of Jury Commissioners that the use of these white and yellow slips was designed for purposes of racial discrimination, and it has not been shown that they could serve any other purpose. So far as the particular facts of this case are concerned, we may accept the testimony of the judge who drew the slips from the box as to the honesty of his purpose; that testimony does not refute the fact that there were opportunities to discriminate, as experience tells us there will inevitably be when such differentiating slips are used. In this case the opportunities are obvious, partly because the aperture in the box was sufficiently wide to make open to view the color of the slips and partly because of the subsequent use or abuse that could be made of the slips however fairly drawn. However that may be, opportunity for working of a discriminatory system exists whenever the mechanism for jury selection has a component part, such as the slips here, that differentiates between white and colored; such a mechanism certainly cannot be countenanced when a discriminatory result is reached. The stark resulting phenomenon here was that somehow or other, despite the fact that over 5% of the slips were yellow, no Negro got onto the panel of 60 jurors from which Avery's jury was selected. The mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity.

Accordingly, I concur in the judgment.