ANDRÉS BÁEZ CANCEL ET AL., Petitioners and Appellants, *v.* SANTOS RIVERA PÉREZ ET AL., Respondents and Appellees.

No. O-71-103.        Decided December 7, 1972.

*Elí Beléndez García* and *Salvador Acevedo Colón* for appellants.
*Antonio Bauzá Torres* for appellees.

MR. JUSTICE TORRES RIGUAL delivered the opinion of the Court.

■ To enforce the constitutional guarantees established in the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico for the protection of individual rights is an inevitable function of this Court. The present case demands the exercise of that function with respect to the constitutional guarantee against discrimination on account of political ideas. Section 1, Art. II of the Constitution of the Commonwealth of Puerto Rico.

This case deals with a writ of mandamus urged by several foremen of the Municipality of Guaynabo to order the Mayor to reinstate them in their employment and to pay the salaries accrued up to the date on which they are reinstated. They grounded their petition on the fact that the action of the Mayor removing them was caused by political ideas in violation of the guarantees established in § 1 of Art. II of the Constitution of the Commonwealth. The Mayor objected to the requested remedy adducing that petitioners, appellants herein, were not permanent employees but irregular, that he had never refused to give them employment and that they "merely did not show up for work after January 12, 1969." That is, that the foremen had abandoned their jobs.

The findings of fact of the trial court reveal the following:

Upon assuming the position of Mayor of the Municipality of Guaynabo, appellee, Santos Rivera Pérez, did not any longer use the services of the Director of the Civil Defense and about thirty-three foremen of the gangs working in maintenance and repair of the streets, sidewalks and municipal roads. The foremen as well as the Director of the Civil Defense belonged to the Popular Democratic Party and they were substituted by persons affiliated with the New Progressive Party. The court rejected the Mayor's version to the effect that the said foremen had abandoned their jobs and

that he had never refused to give them employment, concluding, on the contrary, that:

"3. The respondent Mayor, Santos Rivera Pérez, was elected to that position by the New Progressive Party in the general election held in November 1968. He assumed his position on January 13, 1969. Once in power he did not use the services of the petitioners in charge of the aforementioned conservation works any more and had them return the tools in their possession. No charges were preferred against them, nor any formal removal whatsoever was decreed. For the works which they performed persons affiliated to the New Progressive Party were then used. The petitioners were militants of the Popular Democratic Party, some of them having become well known in the recent political struggle as leaders of that party in the several wards or precincts."

■ The foregoing finding notwithstanding, the court considered it unnecessary to draw up a specific conclusion as to the political reasons for their removal for understanding mistakenly that the constitutional guarantee against discrimination by reason of political ideas was not applicable to appellants.

We have examined the record carefully and it is necessary to indicate that the evidence presented supports amply a finding to the effect that appellants were removed by reason of their political ideas.

Thus, Andrés Mojica O'Neill, one of the fired foremen, reports his conversation with the Mayor right after the latter's inauguration. He went to see the Mayor and "I told him 'I have been an employee here in this Municipality for 20 years and I came to receive your orders to see what you order, if I continue the work which I started, or if you are going to transfer me to some other place. . .' and then he answered me, 'the time that you have been working in the Municipality, whether for a long or a short time does not matter, what matters is that you must remember that the situation, that the administration changed,' and I told him:

'the mere fact that the administration has changed frees me from work, I do not have an opportunity?' he told me: 'no, what interests me is that you remember the situation and remember that the administration changed' and I told him: 'Don Santos, remember that I am a family head that I do not have any other source of income but my work, that I have a boy in high school and my removal is going to prejudice me' and told me that question 'remember that the administration changed, that the situation changed.' " (Tr. Ev. p. 13, hearing held September 16, 1969.)

Mojica was replaced by Sergio De Jesús, President of the New Party in the town. (*Id.*)

Pedro Bernabe reported for work on Tuesday, January 14, 1969, the day after the inauguration and he asked the Mayor "if he was going to keep on working that . . . he had been working as foreman of the Municipality for four years and then he told me, 'boy there are two hundred or three hundred already and you have to understand that the Administration changed and that we need that for those of the Palma.' " (*Id.* p. 23.)

Bernabe was substituted by Guillermo Morán, member of the New Progressive Party.

Agapito Fines García talked with the Mayor on Tuesday, January 14, 1969, and the latter told him "that all the foremen, at least me, had been substituted by another foreman, because the Palma had won and they had to assign those jobs to those of the Palma." (*Id.* p. 53.)

Andrés Báez Cancel visited the Mayor on January 14. He testified: "I told him that I was coming to ask for orders, whether I was to continue in my work in the ward or if he was going to transfer me to another ward, I was willing to continue working, and he told me that he did not have any work for me, that we should understand that the Popular party had lost and that the jobs left were for the Palma."

(*Id.* pp. 129–130.) Germán Báez Cancel, his brother, member of the New Party, was appointed to substitute him.

The Director of the Civil Defense, Ebel Aquino Hernández, went to his office to work on the day of the Mayor's inauguration and there a person informed him that another person had been appointed for his job. Then he met the Mayor "and then I talked with him, I asked him what was the matter that there was another person in my office, and he answered me that since they had won, won the election, they had placed another person." (Tr. Ev. pp. 44–45, hearing of September 16, 1969.)

Despite this clear picture of discrimination, the trial court dismissed the complaint because it understood that the foremen were irregular employees without the protection of permanency under the Municipal Merit System. It determined that the aforementioned constitutional guarantee was not applicable, expressing in this respect:

"Petitioners adduce as additional ground in their case the constitutional provisions, Art. II, § 1 of the Constitution of the Commonwealth of Puerto Rico, the provisions of the Municipal Law 1960, *supra,* §§ 91, 92, and 93, and the provisions of the aforementioned Municipal Ordinance, where protection with respect to discrimination by reason of political ideas is established. (Section 44.) These provisions are not applicable in this case, where it appears that petitioners were not entitled to permanency in the employment or work in the Municipal Service. To sustain that these petitioners should be reinstated in their works for the Municipality for this reason would be equivalent to acknowledge the right of permanency, which according to law they do not have. In view of the situation of law applicable to the relationship of these petitioners with the Municipality of Guaynabo, this contention results irrelevant and impertinent to their particular cases."

We do not agree. Section 1 of Art. II of the Constitution of the Commonwealth of Puerto Rico prescribes in a clear manner that "no discrimination shall be made on account of

race, color . . . political or religious ideas." The proscription of discrimination is clear and final. Its text does not permit any distinction. It means to say what it says. That the State in any of its multiple functions or services shall not discriminate against a citizen because of the mere fact that the latter is colored, an atheist, or on account of his political ideas. Any other construction would enervate its efficacy. To strengthen it and not to weaken it is our duty, as the principal custodians of the Constitution.

To limit its application, as the trial court did, to those employees who have permanency under the Municipal Merit System is to force a distinction contrary to its true spirit and purpose. Such a construction would precisely leave the more helpless destitute of protection. As it is known, permanent employees have the protection of the Municipal Law itself which expressly prescribes that "no municipal employee shall be appointed, promoted, demoted, or suspended or in any way discriminated against by reason of race, political ideas or religious creed." Section 92 of the Municipal Law, No. 142 of July 21, 1960, 21 L.P.R.A. § 1552.[1] These employees also have the protection of the Municipal Merit System which

---

[1] The Personnel Act of the Commonwealth, Act No. 345 of May 12, 1947, 3 L.P.R.A. § 676, in its § 36 has a similar provision to protect the employees of the state government:

"(a) No person shall be appointed or promoted to, or demoted or dismissed from, any position in the Competitive Service, or in any way favored or discriminated against with respect to employment in the Competitive Service because of political, religious, or racial reasons.

"(b) No person shall seek or attempt to use any political endorsement in connection with any appointment to a position in the Competitive Service.

"(c) No person shall use directly or indirectly, his official authority or influence to secure for any person an appointment to a position in the Competitive Service, or an increase in pay or other advantage, for the purpose of influencing the vote or political action in favor of any person, or for any other purpose.

"(d) No person elected to a Commonwealth Office shall, during the term for which he was elected, be appointed to any position in the Competitive Service."

requires just cause for the removal, preferment of charges, and hearing. Ordinance No. 29, series 1966–1967 of the Municipality of Guaynabo. None of these protective provisions covers irregular employees. It would be a piece of nonsense to interpret that the Constitution protects the group of employees who need it less—the permanent employees—while it forsakes those who most need its protection.

Appellee argues that the fact that the previous incumbents had belonged to a party and that some of the actual incumbents were of another party does not imply by itself political discrimination. The argument disregards the evidence which revealed that all the dismissed foremen belonged to the party that had lost the election and they were substituted by persons affiliated to the party of the new administration.

■ No justification whatsoever was adduced to remove appellants. It will be remembered that the court did not adopt the Mayor's version to the effect that appellants had abandoned their jobs and that he had never refused to give them employment. We agree that if any reasonable justification would have been adduced the removal would not have implied any discrimination whatsoever. But when without a reasonable justification whatsoever a group of workers clearly identified with a political party are fired and are immediately substituted with another group of persons of different party filiation, as it happened in the case at bar, a strong presumption of discrimination is created. More so when these events occur precisely at the time of the change of a municipal administration to another of a different party.

■ Neither can the argument that the Mayor has ample discretion to employ and fire irregular workers be accepted. The fact that these powers are discretionary shall not justify, excuse or forgive the discrimination. The exercise of discretion cannot serve as a screen to discrimination. On the con-

trary, it would be easy to artificially avoid the constitutional prescription.

■ It is true that it is not necessary to prefer charges against irregular employees to fire them from their employment. The Municipal Law does not require it, neither does the ordinance establishing the Merit System require it without their having any constitutional flaw whatsoever for that reason. The constitutional guarantee does not prevent the Mayor from discharging an irregular employee for no cause at all. Including mere caprice. *Cf. Luce & Co.* v. *Labor Relations Board*, 71 P.R.R. 335 (1950); *L.R.B.* v. *Banker's Club of P.R., Inc.*, 94 P.R.R. 573 (1967).

■ Caprice, nevertheless, should not be favored by law. Therefore, if there is no rational cause justifying the discharge and the employee is substituted by another of different political affiliation, which happens to be the same as the Mayor's, a presumption of discrimination is created, which the Mayor is bound to rebut. *Cf. Avery* v. *Georgia*, 345 U.S. 559; *Whitus* v. *Georgia*, 385 U.S. 545.

The long tradition of discriminations by reason of political ideas in the municipal employment—see as illustration *Bezares* v. *González, Mayor*, 84 P.R.R. 450 (1962)—requires the courts to sift the evidence in order to ascertain that no discrimination actually exists in the action of the nominating authority.

In the case at bar, as we saw already, the evidence showed that appellants were fired by reason of their political beliefs.

The case of appellant Ebel Aquino Hernández, Municipal Director of the Civil Defense, raises a different question from that of the other appellants. Aquino Hernández was appointed by the former Mayor by virtue of the provisions of the Puerto Rico Civil Defense Act, Act No. 183 of May 1, 1951, 25 L.P.R.A. § 130 *et seq.* Said act created the Commonwealth Office of Civil Defense attached to the Office of the Governor,

in order to safeguard the public peace, health, and welfare in general in case of disasters caused by nature or enemy forces. It is a public institution designed for dealing with emergency situations and for those effects it was vested with adequate powers. The law promotes the efficacy of this institution through the centralization of powers in the person of the Governor of Puerto Rico. The general direction and control of the Commonwealth Office of Civil Defense and that of all the municipalities is incumbent upon the latter. He is vested with the power to assume, when he deems it necessary or convenient, the direct control of all or part of the functions and operations of the Civil Defense. Section 6 of the Civil Defense Act, *supra*, 25 L.P.R.A. § 135.

Such is the importance of the element of centralization in the administrative structure of the Civil Defense, that even when the Local Civil Defense Director is appointed by the Mayor with the consent of the municipal assembly, he is subject to the direction and control of the Governor. Even more, the law specifically empowers the Governor *"to make any changes he may consider necessary in the personnel of any local organization."* Section 8, 25 L.P.R.A. § 137.[2]

---

[2] Section 8 (b) insofar as pertinent reads:

"(b) The mayor of each municipality and the City Manager of the Capital, each to be referred to henceforth as 'the mayor,' are with the consent of their respective municipal assemblies, and the Council of Secretaries in the case of the municipality of the Island of Culebra, all to be referred to henceforth as 'the municipal assembly,' hereby authorized to appoint the local civil defense director, who shall be directly responsible for the organization, administration, and operation of the local civil defense agency, subject to the direction and control of the Governor of Puerto Rico, who is hereby empowered to make any changes he may consider necessary in the personnel of any local organization. All municipal civil defense organizations shall exercise their functions within the jurisdictional limits of their respective municipalities, and, in addition, shall exercise such functions outside their municipal jurisdictions as may be necessary in accordance with the provisions set forth in sections 130–146 of this title, or whenever the Governor so requires."

Disasters of any kind—whether caused by nature or by enemy forces—generally create disorders and disturbances in the life of the community. They produce an emergency state that requires rapid and coordinated action. Said action is obtained with more efficacy when the line of power is clear and centralized. That is why the Civil Defense Act confers all the powers to the Governor, including the making of personnel changes that he may deem necessary in any local organization. The exercise of this power by the mayors of the 76 municipalities of Puerto Rico would give margin to conflicts of views which would obstruct the rapid and coordinated action in cases of serious emergencies doing away with the purposes of the Civil Defense Act.

■ As we have seen, the power to effect the changes in personnel corresponds to the Governor of Puerto Rico and not to the mayors. In the case at bar the Mayor of Guaynabo disregarded the statutory provision upon substituting appellant Ebel Aquino Hernández in the position of Municipal Director of the Civil Defense. His action is unlawful and lacks validity.

Judgment will be rendered reversing the judgment rendered by the trial court.

Mr. Justice Martínez Muñoz and Mr. Justice Martín dissented in a separate opinion.

—O—

MR. JUSTICE MARTÍNEZ MUÑOZ, with whom MR. JUSTICE MARTÍN agrees, dissenting.

San Juan, Puerto Rico, December 7, 1972

I concur with the majority in that the irregular employees, not permanent, of the government and of its agencies and of the municipalities are constitutionally protected in their employment against the discriminatory removal by reason of political ideas. The long tradition of discriminations by rea-

son of political ideas in the municipal employment, as is pointed out in the majority opinion, requires the courts to sift the evidence in order to make themselves sure that no discrimination actually exists in the action of the nominating authority.

With what I cannot agree, nevertheless, is with the result reached in this case. Without the benefit of having heard the witnesses nor observed their conduct, the majority has become today a trial court and trier of an issue of fact which was not adequately raised either by the petitioners or by the respondents or decided by the respondent court, to wit: the political reasons of the alleged removal as a question of fact.

Petitioners' allegations presented the following theory: petitioners (originally 32 in all) were *permanent employees* who were removed for political reasons. Appellee's position always was that the petitioners were not permanent employees, but *irregular employees*, who abandoned their jobs and were substituted by others.

The trial judge, more than once during the trial, stated to the parties what was, according to his opinion, the point at issue. The trial judge sustained the view, as it appears from pages 81–82 of the transcript (piece II), that if the employees were *regular* employees and if they abandoned their jobs it was necessary to prefer charges to each one. The judge stated thus, after ten petitioners had testified:

"JUDGE: (addressing himself to petitioners' counsel)

I frankly believe, colleague, I believe that we are losing time, because this here is a repetition of the same, the same thing. What the court has technically to decide is whether these employees, under these circumstances are personnel protected by the provisions of § 93 of the Municipal Law, if their positions are regular, the irregularity of the work they perform. I would use, with what has been stipulated, the act of municipal hearing, I mean, not municipal hearing, but preliminary hearing with the exhibits which have been submitted. The essential fact of the employment of these petitioners with the Municipality and the

regularity with which they work in the Municipality has been delineated. I am not sure in relation to the wage, because the wage is not . . . .

PETITIONERS:

It would not be a problem, because we can stipulate, besides it is not necessary.

JUDGE:

The question is whether these employees requested reinstatement, if they reported to work, abandoned the work. I consider it essential if a regular employee protected by said § 93, then the only valid remedy [*sic*] is through the preferment of charges, if the employee abandons his position the Mayor has to prefer charges and a hearing is set and it is determined whether or not he abandoned it, that is the just cause that he sets forth. Therefore these circumstances do not relieve the Mayor from the preferment of charges if employees covered and protected by § 93 of the Municipal Law and covered by the Ordinance of Merits are involved.

RESPONDENTS:

Eh . . . .

JUDGE:

These reports which the witnesses are making and then the cross-examination to challenge what we say as to whether or not they in fact saw the Mayor, if they have been present, is nothing pertinent to the case."

The trial judge in his judgment, concluded that the petitioner employees were not regular employees but they did fall "[u]nder the classification of irregular personnel, excluded from the Competitive Service" and that "in view of the legal situation applicable to the relationship of these petitioners with the Municipality of Guaynabo, this contention (removal for political reasons) results irrelevant and impertinent to their particular cases."

The judge did not make a specific finding of fact as to the alleged political motivation. Neither "did he reject," as it is affirmed in the majority opinion, the theory and version of the respondent that petitioners *did not appear for work*. Of the

thirty-two petitioners, four desisted and only ten offered their testimony. Of the ten, three did not offer testimony in which to support the finding of fact, which the majority of the court now makes, that they were removed for political motivations.[1]

I believe that it corresponds to the trial court, as court of first instance, to make findings of fact which on account of a mistaken concept of the true controversy (as we see it now) it considered "irrelevant and impertinent to their particular cases." For that purpose I would set aside the judgment appealed from and I would remand the case to the trial court to proceed in a manner consistent with the foregoing.

---

[1] These three are Manuel Crespo Reyes (pp. 33–37); Carmelo Robles (pp. 48–52); and Ambrosio Rosado (pp. 64–73).