**STATE of Missouri, Respondent,**

v.

**Yuris JACKSON, Appellant.**

**No. 57348.**

Missouri Court of Appeals, Eastern District, Division Two.

March 19, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 15, 1991.

Application to Transfer Denied June 11, 1991.

Loyce Hamilton, St. Louis, for appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

GARY M. GAERTNER, Presiding Judge.

Appellant, Yuris Jackson, appeals his jury conviction for the offense of criminal possession of a short-barrelled shotgun, RSMo § 571.020 (1986), for which he was sentenced to five years in prison. On appeal, appellant claims that the trial court erred in denying his motion to quash the jury panel pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We affirm.

Around midnight of April 26, 1988, Officer Alderick Reed of the St. Louis City Police Department received a call that shots were fired in the rear of the 1700 block of North Union, near the 5300 block of Patton Street. Officer Reed, in his one man car, immediately responded to the call. Officer Donald Komor, also in a one man car, assisted.

Officer Reed testified that Patton dead-ends after approximately 100 feet and that an alley runs adjacent to the street at that point. As he approached the alley, Officer Reed observed two subjects standing in the front yard of 5370 Patton. One of the subjects, identified at trial as the appellant, bent over, picked up a shotgun and ran towards the residence at 5371 Patton. Officer Reed yelled at the appellant to stop, but appellant refused to comply and entered the house. Officers Reed and Komor gave chase.

Upon knocking on the front door of the residence, Officers Reed and Komor were greeted by the appellant. The appellant claimed that he had not heard Officer Reed yell at him to stop. At this point, appellant's girlfriend, the owner of 5371 Patton, arrived at the front door and gave the officers permission to enter and search the premises. The shotgun was soon found underneath a pile of laundry on the living room couch.

Appellant's trial commenced on August 9, 1989. At trial, appellant testified that he had never seen the shotgun before and that, shortly before the police arrived, his neighbor had run into the house where the gun was found and then fled. The jury rejected appellant's story and convicted him as charged. This appeal followed.

Appellant's sole point on appeal is that the trial court erred in denying his motion to quash the jury panel pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor below used five of his six peremptory challenges to remove blacks from the jury. The petit jury consisted of three blacks and nine whites. Appellant is also black. After the State had made its peremptory strikes, appellant made his motion to quash the jury pursuant to *Batson*. The court then asked Mr. Sweeney, the attorney for the State, to give reasons for his strikes:

MR. SWEENEY: ... Mr. Mitchell. He stated that his one-year-old niece was shot and killed two weeks ago by another child. This is an incident that is—

THE COURT: High publicity.

MR. SWEENEY: And further, as part of that publicity, it's known that quite possible that the mother who is also his relative could be charged in that case. And our office—of course, Mr. Peach is the one that's made statements to that affect that have been publicized. So I mean it's a concern that he would be feeling that our office was persecuting his family as what—

THE COURT: Go ahead with Wheeler.

MR. SWEENEY: Your Honor, as you know, the state filed a—I mean made an oral motion to strike him for cause, which was overruled because of his comments about the fact that the Court heard his own divorce last year and he felt that he was treated unfairly. I'm just worried that that could somehow affect his ability to be fair.

THE COURT: We had an extensive discussion off the record, and I had somewhat injected—and perhaps now I should not have—my definite feeling of Mr. Wheeler: that he held some bitterness towards the Court, although he proclaimed and professed he did not. I made a statement, "I thought he had his fingers crossed." What I meant by that was I wasn't convinced—I still maintain that I still don't think it rose to a position for a strike for cause. I can certainly sympathize with either one of the parties that they would feel uncomfortable having him on the jury. It has absolutely nothing to do with race. He must think that I'm all over the place. He felt himself kicked in the shins last year and here he is back here. It's me. Go ahead.

MR. SWEENEY: Okay. Your Honor, the next one is ... Joan Graham. Miss Graham ... also appeared to be bored and several times saw her looking around while questions were being asked, looking away from the lawyers, looking around the courtroom, not paying attention. In addition, she never answered any question that I asked. And not only that, but almost never looked even in my direction the entire time. And as the Court has already pointed out—well over an hour—that I was asking questions.

And the one time that I directly addressed her when I was going one by one with each juror about their occupations and directly addressed her, she appeared to wake up or be startled when I got to her, and then still did not make eye contact with me in answering. I mean it's just my concern that she doesn't want to be here. She has an attitude which would interfere with her ability—

THE COURT: For the record, and while it's fresh in my mind, she's the one sitting closest to me?

MR. SWEENEY: That's correct.

THE COURT: And I marked on my sheet "demeanor," and I concur in all the things you said, and I was watching her because I noticed exactly the same thing. Now, I'll say this, it was a rather lengthy Voir Dire, and I'm sure there was some people nodding off, but her stance and her whole position, her whole demeanor, had I been in the position that the state was in, I would have made the strike myself. That's about the only way I can go with these things, and for the same reasons, that she just didn't want to be here, she was resentful looking and—okay.

MR. SWEENEY: The same basic set of reasons apply to Miss Douglas, fifth one on the same page. Again, she didn't have any responses to any questions other than when I directly addressed her. When I did directly address her, her answers were, I thought, just a little bit strange. She's listed as a teacher. I asked her, "Do you work for the Board of Education?" "Yes." "What school?" She said—I just thought she was evasive. She said, "Several schools." And then I asked her, "Elementary or secondary?" She said, "Mostly elementary."

Now, that in and of itself wouldn't be so bad except it's coupled with the fact that again she at several times during the Voir Dire had her hand—her chin in her hand resting. She was looking at me sort of out of the side glancing and was sort of positioned in her chair where she was more looking out the back courtroom door half the time than she was looking directly at me. And again, demeanor is the reason.

\*     \*     \*     \*     \*     \*

THE COURT: ... I didn't notice as much as you noticed, but you were face to face with her. What I did notice was the sharpness of the answer. She didn't really want to be bothered. Once again, this was late in the afternoon, but I don't think there's anything that would indicate to me that that—the reasons were racially neutral. What's the last one?

MR. SWEENEY: The last one, the lady stated she had back problems due to her occupation; that she would take her medication tomorrow. When Mr. Cleavelin asked the first time if it would make her drowsy, she said she wasn't sure. And then she amended that and said no.

THE COURT: Where is she?

MR. SWEENEY: I'm sorry. That's on Page 5, Number 3, Rosie L. Smith. She's a nurse's aid at the State Hospital, State Habilitation Center on Bellefontaine Road. That was again the only response she made to any question that I asked was was when I asked her about her occupation, and then—and in response to Mr. Cleavelin's last question about anybody have any medications or disabilities, she was—that's when she answered she had back problems.

THE COURT: How about the alternate?

MR. SWEENEY: The alternate strike, he raised his hand—two things which when I was asking about whether fingerprints would be necessary: he was the only juror who raised his hand. I think I clarified it for him, but still that was a—

THE COURT: Is that Harvey?

MR. SWEENEY: Yes.

THE COURT: Okay.

MR. SWEENEY: And he also acknowledged, I believe, in response to Mr. Cleavelin's question—no, I think it was when I was asking questions, and even though it wasn't directly responsive—I was dealing with the question about the state having the burden of proof, and he volunteered something along the lines of, 'Well, what if the defendant doesn't testify' or something like that, a question which I could not answer because I am not allowed in any way to comment on it—

THE COURT: Uh-huh.

MR. SWEENEY: That leaves me with a bad feeling, because it always leaves with me—he's asked me a question; I have obviously evaded it. I have no idea where it's going to take him, but there's no way I can ever find out either. ·

THE COURT: He was left in that position. The question was, if I recall it, "Isn't he allowed to testify" or words to that affect.

MR. SWEENEY: Yeah.

THE COURT: You couldn't say yes or no.

MR. SWEENEY: Right.

THE COURT: Sometimes you talk and you get yourself boxed in.

Mr. Cleavelin?

MR. CLEAVELIN: Nothing else for the record.

The court then accepted the State's reasons as racially neutral. Appellant contends that the trial court should have rejected the State's explanations for his strikes in that they were pretextual, not supported by the record and because similarly situated white jurors were not struck on similar grounds.

■ In a *Batson* case, while the defendant may "rely on the fact ... that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 citing *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953), the ultimate burden of persuasion lies with and never shifts from the defendant. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *State v. Antwine*, 743 S.W.2d 51, 63 (Mo. banc 1987). In making a prima facie case of discrimination, the defendant must show three things: 1) that defendant is a member of a cognizable racial group; 2) that the State used peremptory challenges to remove prospective jurors of the defendant's race; and 3) that "these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723; *State v. Hall*, 785 S.W.2d 652, 655 (Mo.App., E.D.1990).

By making a prima facie case, the defendant creates a rebuttable presumption that the prosecutor has exercised his peremptory challenges in a discriminatory manner. *Antwine*, 743 S.W.2d at 64. The burden of *production*, not proof, then shifts to the State to come forward with racially neutral reasons for its strikes. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *Antwine*, 743 S.W.2d at 64. These reasons must give a "clear and reasonably specific explanation of the State's legitimate reason for exercising the challenges." *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. If the State presents such race neutral reasons, the presumption raised by the prima facie case is rebutted. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. Defendant then has "the *obligation* to demonstrate that the State's explanations are merely pretextual and, thus, not the true reason for the use of the State's peremptory challenges." *Antwine*, 743 S.W.2d at 64 (emphasis added).

■ After the State gave the court its reasons for its strikes, the court presented the appellant with the opportunity to challenge the State's reasons as pretextual. Appellant declined to accept the court's invitation. Appellant was content with the State's reasons at the trial court level. Now, for the first time, he contends that the reasons given by the State were invalid. We do not believe that the appellant's challenge to the State's reasons is preserved for review. Those best qualified to determine the validity of the prosecutor's reasons were in the courtroom at the trial level. The cold printed word provided by the transcript does not tell us anything about the prosecutor's demeanor towards the venire, nor does it tell us anything about the demeanor of the venirepersons' challenged for their inattention to the proceedings. If the trial court and counsel for the appellant were satisfied with the reasons given by the prosecutor, this court is hardly in the position to disagree. See *State v. Hall*, 785 S.W.2d at 656.

■ Even were we to review the findings of the trial court, we would not be able to say that they were clearly erroneous. *State v. Moore*, 782 S.W.2d 698, 699 (Mo.App., E.D.1989). Findings of the trial court in *Batson* cases are clearly erroneous only when the reviewing court is left with a definite and firm impression that a mistake

has been made. *State v. Shelby*, 782 S.W.2d 703, 705 (Mo.App., W.D.1989).

■ We have set out the reasons for the State's strikes above. While the reason given for striking Venireman Smith is not fully supported by the record, the transcript of the voir dire, the reasons given by the State for its strikes and the fact that three blacks were on the petit jury all undercut any inference of racial discrimination. We find the arguments of the appellant unavailing and affirm the decision of the trial court.

CRANDALL, C.J., and CRIST, J., concur.