# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 16, 2010 Session

## STATE OF TENNESSEE v. JASON LEE WHITE

**Appeal from the Circuit Court for Montgomery County**
**No. 40800449     Michael R. Jones, Judge**

---

**No. M2009-00941-CCA-R3-CD - Filed May 12, 2010**

---

The Defendant, Jason Lee White, was convicted by a jury of one count of burglary, one count of aggravated robbery, and one count of especially aggravated kidnapping. In this direct appeal, he contends that the trial court erred: (1) in denying his motion to set aside his conviction for especially aggravated kidnapping; and (2) in upholding the State's use of a peremptory challenge under Batson v. Kentucky, 476 U.S. 79 (1986). After our review, we reverse and dismiss the Defendant's especially aggravated kidnapping conviction. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court**
**Affirmed in Part; Reversed in Part**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Lance Miller, Clarksville, Tennessee, for the appellant, Jason Lee White.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; John W. Carney, District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual Background

The events underlying this case began on January 8, 2008. Mark Thomas, a District Supervisor with the White Castle restaurant chain, testified that a robbery took place on that evening at one of the Clarksville White Castle restaurants under his supervision. He determined that about $1,400 was stolen. He also said that the store used a number of cameras to record surveillance video at all times. Mr. Thomas recovered the video relevant to this case and gave it to Detective Desmoine Chestnut of the Clarksville Police Department ("CPD").

Denise Wright testified that, on January 8, 2008, she was employed as a crew manager at the White Castle on Wilma Rudolph Boulevard in Montgomery County. She and Penyatta Payne were the only employees present in the restaurant at 11:55 p.m. Ms. Wright began to close the restaurant for the evening. After locking the outside doors, she walked toward the women's restroom. As she walked into the restroom, she "had someone come up behind me with a gun and they made me get down on the floor and told me . . . that if I cooperated, there would be no problem and asked me if there was anyone else in the store and I proceeded to tell them that [Ms. Payne] was in the back."

The perpetrator ordered Ms. Wright onto her hands and knees. He then kicked her in order to force her stomach to the bathroom floor. He took the set of keys Ms. Wright had on a bracelet around her arm; the set contained the key needed to open the door to the employee room, but did not contain the safe key. The perpetrator told Ms. Wright that someone named "Joe" would be watching her. He then left the bathroom. Ms. Wright heard the perpetrator yell that he wanted to be let in to the employee room.

Shortly thereafter, the perpetrator returned to the bathroom and asked Ms. Wright if she had any other keys. She responded that she had the safe key in her pocket. The perpetrator then ordered Ms. Wright to stand up. She did so. He pressed his gun to the back of her head and directed her to the door to the employee room. Ms. Wright opened it; she and the perpetrator proceeded to the back office, in which Ms. Payne was attempting to open one of three safes. Ms. Wright opened that safe and told the perpetrator she did not have access to the other two safes.

The perpetrator took the money in that safe. He also took a computer monitor, Ms. Wright's and Ms. Payne's cell phones, and all of the other phones in the restaurant, which he had Ms. Payne gather for him. He then ordered Ms. Wright and Ms. Payne to lie on the

office floor and wait eight or nine minutes. He left. The State played the White Castle's surveillance video of the robbery.

After waiting eight or nine minutes, Ms. Wright and Ms. Payne stood up and searched for a phone. Realizing that all of the phones in the White Castle were gone, they walked to a nearby Wal-Mart store and used a bystander's cell phone to call the police and the White Castle's manager. Ms. Wright spoke to police, noting that the perpetrator wore black pants and a red hooded sweatshirt. She did not recognize his voice, and she did not see his face.

CPD Detective Martin Hall testified that he had viewed the surveillance video and discussed the case with Det. Chestnut. He also said he was acquainted with the Defendant, having interacted with him several times while working in the CPD's Criminal Investigations Unit. The State showed Det. Hall three pictures of the perpetrator gleaned from the White Castle surveillance video; Det. Hall said that each of the pictures showed the Defendant in "a red hoodie with a black jacket on." He admitted on cross-examination that the photos did not allow one to see the perpetrator's ears or hair. Detective Hall noted that, but for processing the surveillance video and photos taken therefrom, he had no involvement in this case. He had been the first to opine, based his review of the video, that the Defendant was the perpetrator, however.

Ms. Payne also testified. She said that she was a White Castle employee on January 8, 2008, and had closed the store that night with Ms. Wright. She noted that she had known the Defendant for about two years at that time and that she had been intimate with him on one occasion. She said the Defendant had called her cell phone number, 278-1674, and that she had frequently and successfully contacted him by using what she believed to be his cell phone number, 249-0266.

Ms. Payne said that, in October or November 2007, the Defendant called her and asked how much money he could get by robbing the White Castle at which she worked. She estimated that he could get a maximum of $1,500. At that time, she did not discourage him from attempting the robbery. In the days leading up to January 8, 2008, the Defendant left Ms. Payne a series of messages regarding his plan. She called him back on the day of the robbery and told him his plan was a bad idea, that the police had been watching the White Castle, and that he would not be able to get very much money. The Defendant responded that "it might be like taking candy from a baby."

Just before midnight on the evening of the robbery, Ms. Payne saw the Defendant standing on the customer side of the ordering counter. She did not see him a few minutes later after Ms. Wright had locked the store's outside doors; she therefore assumed he had left. She then opened the door to the employee room. The Defendant appeared and walked

through the door behind her. He then gave her a key and told her to open the safe; Ms. Payne realized he had given her the wrong key, however, and communicated this to the Defendant. She saw that the Defendant had "a black gun."

The Defendant left the employee room, returning with Ms. Wright a few moments later. Ms. Wright gave Ms. Payne the safe key. Ms. Payne opened the safe and put the money therein into a bag. The Defendant then collected all of the phones in the restaurant.

Ms. Payne gave a statement to the police later that night in which she did not name the Defendant as the crime's perpetrator. At trial, she said she failed to do so because she was afraid of the Defendant. She also failed to pick the Defendant out of a photo lineup later shown to her by Det. Chestnut. She admitted that her concealment of the perpetrator's identity led to her pleading guilty to one count of being an accessory after the fact to aggravated robbery. She had also been charged with conspiracy to commit aggravated robbery.

Ms. Payne said she later decided to tell the truth because she did not want to get into more trouble, and because the State informed her that she might face a long period of incarceration if she continued to lie. At trial, Ms. Payne identified the Defendant as the perpetrator of the robbery and picked him out of a photo lineup.

On cross-examination, Ms. Payne admitted that, in a March 24, 2008 statement, she had said the Defendant was 100 feet away from her when she first saw him in the White Castle the evening of the robbery. She also admitted that she had not previously mentioned the Defendant's "candy from a baby" prognostication.

Detective Chestnut also testified. He said that he did not know the Defendant prior to this case and could not identify the perpetrator shown in the White Castle surveillance video. Detective Hall, having also reviewed the video, later identified the Defendant. Detective Chestnut spoke to Ms. Payne and Ms. Wright. Ms. Payne eventually identified the Defendant as the perpetrator of the robbery. Detective Chestnut also discovered that the cell number at which Ms. Payne said she reached the Defendant, 249-0266, was actually registered to the Defendant's mother. Detective Chestnut obtained phone records showing a number of voice and text contacts between that number and Ms. Payne's at 11:30 p.m. on January 8, 2008. He also discovered a call from the White Castle's phone line to the Defendant's mother's number.

Detective Chestnut also spoke to the Defendant, who turned himself in voluntarily upon learning he was a robbery suspect. The Defendant said he did not know Ms. Payne, had not been to White Castle recently, and was home with his girlfriend, Amelia Shine, at the

time of the robbery. The State introduced phone records, however, showing that text messages were sent between the Defendant's mother's cell and Ms. Shine's cell at 12:08 and 12:26 a.m. on January 9, 2008, minutes after the robbery.

On cross-examination, Det. Chestnut noted that the angle of the White Castle surveillance cameras made it difficult to determine the height of persons shown in the surveillance video. He also noted that no blood, DNA, fingerprints, weapons, or money were recovered in this case. Detective Chestnut chose not to investigate the presence or absence of the accomplice named "Joe" who, according to the perpetrator, watched Ms. Wright as she lay on the floor of the White Castle women's restroom.

The Defendant chose to testify in his own defense. He said that, in January 2008, he lived in the Sunset Village Apartments with his girlfriend, Ms. Shine, and her three children. He was proud of himself for, at that time, lucratively operating a freelance digital photography business. He said he was innocent of the crime charged and knew nothing about the robbery until he was mentioned as a suspect in the local paper a few days after the robbery occurred. He did not frequently dine at White Castle.

The Defendant voluntarily spoke to Det. Chestnut on January 22 or 23, 2008. He explained that he had told Det. Chestnut that he did not know "Penyatta Payne" because he only knew Ms. Payne by her street name. At trial, he admitted that he had known her for a few years, but had never been intimate with her, and saw her at most three times a year at clubs and other social functions. The Defendant also said that he had met Det. Hall only once, for about twenty minutes, in 2003, the year in which he was also convicted of a prior felony, aggravated assault. The Defendant said he never had possession of his mother's cell phone. He also testified, however, that Ms. Payne did not know his mother and therefore would have had no reason to call her or receive calls from her.

The Defendant also announced in his testimony that he knew, beyond any doubt, the identity of the real perpetrator of the White Castle robbery. He refused to reveal the perpetrator's name, however, because "[i]f it didn't have anything to do with me I mind my business and go about my own business. That's how I do it." The Defendant claimed to have known the perpetrator's identity when he originally spoke to Det. Chestnut; he declined to share the information at that time because he wanted to wait for his "day in court." His day in court having arrived, however, the Defendant still declined to divulge his exculpatory secret because he felt that he should not have to do Det. Chestnut's job for him.

The Defendant was convicted as charged. He now appeals.

**Analysis**

**I. Especially Aggravated Kidnapping**

The Defendant first contends that his conviction for especially aggravated kidnapping violates his right to due process of law under article I, section 8 of the Tennessee Constitution, and that the trial court erred in denying his motion to dismiss that conviction. "The determination of whether due process has been violated is purely a question of law." State v. Cozart, 54 S.W.3d 242, 247 (Tenn. 2001). We review a trial court's applications of the law to the facts de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

For the purposes of this case, "[e]specially aggravated kidnapping is false imprisonment . . . accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), our supreme court held that due process principles require courts to determine "whether the confinement, movement, or detention [involved in a kidnapping conviction] is essentially incidental to the accompanying felony . . . or whether it is significant enough, in and of itself, to warrant independent prosecution." Id. at 306. The supreme court refined this "essentially incidental" test in State v. Dixon, 957 S.W.2d 532 (Tenn. 1997). In Dixon, the defendant, convicted of aggravated kidnapping, aggravated assault, and attempted sexual battery, initially restrained the victim on a lighted sidewalk. Id. at 533. After slamming her to the ground and choking her, he "dragged her approximately thirty to forty feet . . . into or behind foliage growing on the back of an adjacent vacant lot." Id. He then continued to assault and attempt to sexually batter her.

Instead of simply considering whether the Dixon defendant's removal of his victim was "essentially incidental" to the aggravated assault and attempted sexual battery, the Dixon court more clearly delineated a two-part test based on its reasoning in Anthony. First, a reviewing court must "decide whether the movement or confinement was beyond that necessary to consummate the [underlying felony]." Id. at 535 (citing Anthony, 817 S.W.2d at 306). "If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. (citing Anthony, 817 S.W.2d at 306). If so, the kidnapping conviction does not violate due process. Id. The court upheld the Dixon defendant's aggravated kidnapping conviction, holding that

he could have attempted the sexual battery on the sidewalk but moved the victim to lessen his risk of detection. Id.

The court also noted that application of this two-part rule would not have altered the outcome in Anthony because, "[i]n Anthony, the movement or confinement did not exceed that normally incident to robbery." Id. Anthony involved the robbery of a Shoney's Restaurant:

> The restaurant had just closed. Behind the establishment there were three employees emptying garbage into a dumpster. The defendants approached the three outside employees and forced them at gun-point to lie on the ground. One defendant remained with the three outside employees while the other defendant entered the restaurant.
>
> The defendant entering the restaurant initially encountered two additional employees inside the restaurant. The defendant ordered, at gun point, the two employees to an office in the back of the restaurant. When they arrived at the office, the defendant demanded that the safe be opened. The defendant was then informed that the safe was in the front of the restaurant by the cash register. The defendant then instructed one of the employees to lie on the floor of the office as he and the other employee went to the front of the restaurant. After taking money from the safe, the defendant encountered a third employee exiting a restroom. The defendant pointed his gun at the employee and instructed him to "get back in the men's room and stay there." The defendants then fled the scene. The entire episode lasted approximately five minutes.

Id. at 533-34.

In State v. Richardson, 251 S.W.3d 438 (Tenn. 2008), our supreme court applied the Dixon rule to the robbery of a Calhoun's Restaurant. After the restaurant had closed, the Richardson defendant put a gun to the head of a manager, Allison Howell, and forced her upstairs toward the restaurant's office area. Id. at 440. After learning from Ms. Howell that another manager, Johnnie Lucas, was in the office, the defendant put Ms. Howell in "a partially caged area in the stock room" and struck her in the face. Id. He then confronted Ms. Lucas in the office and demanded that she open the safe; when she had difficulty doing so, he straddled and beat her for about twenty minutes. Meanwhile, the defendant's accomplice went to the stock room and bound Ms. Howell's hands with duct tape. Soon thereafter, the defendant dragged Ms. Lucas from the office to a ventilation room, beat her further, and instructed her to stay there, "threaten[ing] to kill [her] if she moved." Id. Both

the defendant and his accomplice obtained the safe combination, from Ms. Lucas and Ms. Howell, respectively, but were apparently unable to open the safe.

The Richardson court held that "[t]he Dixon two-part test fully replaces the Anthony 'essentially incidental' test." Id. at 443. The court applied that test to the kidnappings of both Ms. Howell and Ms. Lucas. In holding that Ms. Howell's "movement and confinement were beyond that necessary to consummate the attempted especially aggravated robbery," the court emphasized that the defendant "moved her to an empty stock room" instead of "leading her to the office where the safe was located" and that she was subsequently bound and confined for over twenty minutes. Id. at 444. Regarding Ms. Lucas, the court noted that she was also confined and beaten for about twenty minutes: "the length of time that Richardson beat Lucas in the office is relevant to show that the restraint was excessive and beyond that necessary to consummate the attempted especially aggravated robbery." Id. at 445. Both kidnappings thus passed the first prong of the Dixon test.

Using these precedents, we must first "decide whether the [Defendant's] movement or confinement [of Ms. Wright] was beyond that necessary to consummate" the aggravated robbery in this case. Dixon, 957 S.W.2d at 535 (citing Anthony, 817 S.W.2d at 306). In denying the Defendant's motion to dismiss his especially aggravated robbery conviction, which it acknowledged was a "very close" issue, the trial court explained that

> [the Defendant] took [Ms. Wright] and put her in the restroom at gunpoint, took the key and kicked her . . . [a]s [the Defendant] believed at that time, that he had enough help or whatever to finalize the robbery, the aggravated robbery. However he was frustrated when he got in there and he couldn't open the safe and so he had to . . . remove [Ms. Wright] from the bathroom and take her into the office. He had [sic] taken her immediately to the office originally, that certainly would have been part of the aggravated robbery.

In its brief, the State similarly argues that the Defendant's movement of Ms. Wright from the White Castle women's bathroom to its employee room was not necessary to consummate the aggravated robbery because the Defendant could have retrieved the safe key from Ms. Wright's pocket rather than requiring her to accompany him to the employee room. Although we agree that the Defendant's movement of Ms. Wright to the employee room was not strictly and absolutely necessary to complete the aggravated robbery, our review of Anthony, Dixon, and Richardson lead us to conclude that our supreme court did not intend Dixon's first prong to be applied so literally.

The first prong, in other words, does not require a Defendant to demonstrate that consummation of the applicable underlying felony would have been entirely impossible

-8-

without the movement or confinement alleged to constitute kidnapping. The supreme court has explicitly approved of the result in Anthony under the later Dixon test. See Dixon, 957 S.W.2d at 535. The State's argument, if followed, would change the result of Anthony because the robbers therein could conceivably have completed the robbery, without moving an employee to the safe, by obtaining either the safe key, combination, or other unlocking mechanism from that employee.[1] See generally Anthony, 817 S.W.2d at 301.

Further, the Richardson court implied that the defendant therein would not have committed kidnapping had he "[led] Ms. Howell to the office where the safe was located" rather than "[moving] her to an empty stockroom"; this was so even though the defendant could conceivably have completed the robbery by obtaining the safe's combination from Ms. Howell and declining to move her at all. Richardson, 251 S.W.3d at 444. Finally, we note that a literal interpretation of Dixon's first prong might support a separate kidnapping conviction for a hypothetical robber who, encountering a employee ten feet away from a key-locked safe, ordered the employee to open the safe rather than demanding that the employee remain still while the robber retrieved the key from his or her pocket. In our view, Dixon does not dictate this result.

We conclude that the facts of this case are most analogous to the Dixon-approved facts in Anthony. We are aware that the Defendant, due to his key-related confusion, did not immediately take Ms. Wright to the White Castle employee room, instead briefly leaving her on the women's bathroom floor; we disagree with the trial court's conclusion that this fact is legally relevant under the Dixon test, however. The Defendant moved Ms. Wright a similar distance as the Anthony defendants moved the Shoney's employees; he also moved her for a similar purpose, namely the direct and expedient completion of a robbery. These facts stand in contrast with those of Richardson, in which Ms. Howell and Ms. Lucas were confined for a length of time, and beaten with a severity that actually distracted their assailants from completing the contemplated robbery.

The Defendant has successfully demonstrated that his movement of Ms. Wright was not beyond that necessary to complete his aggravated robbery. Dixon, 957 S.W.2d at 535 (citing Anthony, 817 S.W.2d at 306). We therefore need not consider Dixon's second prong. We accordingly conclude that the trial court erred in denying the Defendant's motion to vacate, as violative of due process principles, his conviction for especially aggravated kidnapping.

---

[1]The facts in Anthony do not specify the Shoney's safe's locking mechanism.

## II. Batson

The Defendant next contends that the trial court erred in denying his Batson objection to the State's use of a peremptory challenge. Because the record does not reflect that Defendant filed a motion for a new trial, this issue is waived. See Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error . . . upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived).

We must consider, however, whether the Defendant has established plain error. See Tenn. R. App. P. 52(b). Plain error requires that five factors be established: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

The Defendant, an African-American, challenged the State's use of its peremptory challenge as race-based in violation of Batson v. Kentucky, 476 U.S. 79 (1986). The United States Supreme Court has articulated the process through which a party can show a violation of the Equal Protection Clause of the Fourteenth Amendment in an opposing party's use of peremptory challenges during jury selection. First, the challenging party must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94. To establish a prima facie case in the context of a peremptory challenge of a venire member, a defendant

> first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'

Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)).

> Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

-10-

Id. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors . . . related to the particular case to be tried." Batson, 476 U.S. at 97. The trial court must then decide whether the defendant has shown purposeful discrimination. Id.

When ruling on an alleged Batson violation, the trial court must articulate specific reasons for each finding on the record, "i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn. 1996). On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." Id.

During jury selection, the State peremptorily challenged one of the African-American members of the venire based on the following exchanges:

> [The State]: Somebody is going to pick out the Defendant and say that is the one that did it? What are some of the things that you would require from this person when they are identifying someone, that you would want them to be able to tell you to be certain that they knew who that person is? What are some of the things that you would look for?
>
> . . . .
>
> [Challenged Juror]: Just to make sure that there wouldn't be any reason for them to say that, you know, what I mean by that? Any unrelated reason for them to say that that was who it was?
>
> [The State]: So if they had some sort of motive to lie or –
>
> [Challenged Juror]: Right –
>
> [The State]: – something like that?
>
> [Challenged Juror]: Right, a reason to lie –

The State did not challenge this juror after this first round of questioning. It continued to question her later, however:

[The State]: . . . let's go back to a few things you said about identification. You would want to know if the person had a reason to lie? For – give us some examples of what do you think 'reasons to lie' what would that be?

[Challenged Juror]: I mean like if someone, you know, advised him to say that, if they had a circumstance that they – you know – like if someone told them to say that or if they had a problem with somebody that they had – you know, that had a reason to say that other than that's what they really saw or that's what really happened?

The State then challenged this juror, and the Defendant requested a Batson explanation for the challenge. The State responded, "What she offered was I would be looking for a reason that they would lie . . . . Now, what that tells me is that she is going in to see why they would like [sic]?" The trial court accepted this as a race neutral reason and allowed the State to strike the challenged juror.

We conclude that the Defendant cannot show plain error because the trial court breached no clear and unequivocal rule of law. See Adkisson, 899 S.W.2d at 641-42. In our view, the State's challenge was motivated by a race-neutral concern that the challenged juror would unduly question the credibility of State's witnesses. The trial court did not abuse its discretion in accepting this as a race-neutral justification. See Batson, 476 U.S. at 97. This issue is without merit.

**Conclusion**

Based on the foregoing authorities and reasoning, we reverse and dismiss the Defendant's conviction for especially aggravated kidnapping. In all other respects, the judgments of the trial court are affirmed.

_____
DAVID H. WELLES, JUDGE

-12-