IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 17, 2010

**STATE OF TENNESSEE v. ANDRE ALEXANDER SMITH**

**Appeal from the Criminal Court for Davidson County**
**No. 2007-D-3091      Cheryl Blackburn, Judge**

_____

**No. M2008-02852-CCA-R3-CD - Filed May 14, 2010**

_____

The Defendant, Andre Alexander Smith, was tried before a jury on an indictment charging one count of first degree felony murder.  He was found guilty of one count of the lesser-included offense of voluntary manslaughter.  In this appeal, the Defendant contends that (1) the trial court erred in upholding the State's use of peremptory challenges under Batson v. Kentucky, 476 U.S. 79 (1986); (2) the State presented evidence insufficient to convict him of voluntary manslaughter; and (3) the trial court erred in overruling his objection to certain portions of the State's closing argument.  After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Jeffrey A. DeVasher, Assistant Public Defender, Nashville, Tennessee, for the appellant, Andre Alexander Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

At trial, the State first presented the testimony of Michael Ellis, the father of the victim, Evan Ellis. Mr. Ellis testified that the victim was twenty-three years old when he was killed in Nashville on the evening of July 30, 2007. The victim, a musician, had moved to Nashville in March 2007; Mr. Ellis believed that the victim worked at a supermarket for a few weeks and played his guitar on the street thereafter. The victim was homeless.

Mr. Ellis testified that the victim had been addicted to drugs since his first year in college. The victim completed two semesters of college, eventually dropping out and joining the army when he was twenty-one years old; after six months in the army, the victim was caught smoking a cigarette and was to be disciplined. He instead chose to leave the army.

Mr. Ellis said he visited Nashville in June 2007 in order to search for the victim; he did not find him. Finally, Mr. Ellis said that the victim had always been a peaceful person.

David Kincherlow, a resident of the University Court Housing Development ("University Court") in Nashville, testified that, on the evening of July 30, 2007, he witnessed part of a fight at the intersection of Carroll Street and First Avenue South near his home. Mr. Kincherlow saw the fight as he walked from University Court to a nearby convenience store. The fight involved a white male (the victim) and a black male. At the time, Mr. Kincherlow did not recognize either of them, but he realized the next day, when he heard that the victim had been killed, that he had occasionally seen the victim walking around the projects wearing a backpack.

Mr. Kincherlow witnessed the victim kicking the black male away; the black male then held the victim and prevented him from moving. The victim asked Mr. Kincherlow for help as Mr. Kincherlow walked by. Seeing a threatening look on the black male's face, however, Mr. Kincherlow kept walking. He did not see anything in either man's hands, nor did he see how the fight started.

Mr. Kincherlow contacted the police the next day. Having seen the upper half of the black male's face, Mr. Kincherlow viewed a six-person photo lineup. He picked the Defendant, and told police he was "at least a seven" on a scale of zero to ten "that that might be him."

Dequan Howse, another resident of University Court, was nineteen a the time of trial and had just graduated from Pearl Cohn Magnet High School. He testified that he saw the

victim stabbed and killed on the evening of July 30, 2007. He had seen the victim around University Court occasionally, and knew his nickname was "Soldier." The victim had told Mr. Howse not to do drugs because they would "make your life go crazy and tear you up." Mr. Howse believed the victim to be homeless, and noted that the victim usually wore a backpack and sometimes carried a guitar, which he would sometimes play on Mr. Howse's back porch. Mr. Howse said that the victim never used drugs in his presence and never caused problems.

Mr. Howse explained that the intersection of Carroll Street and First Avenue South lay between University Court and a convenience store. Near the intersection was a fence in which a large opening had been cut to allow easy travel between University Court and the convenience store area. Mr. Howse had bought some items at the convenience store before witnessing the fight at issue in this case; Mr. Howse said that he saw the victim exiting the store as he entered. The victim was counting a number of twenty-dollar bills; he then folded up the money and put it in his pocket. The victim had a backpack but not a guitar.

Mr. Howse left the store about two minutes later, walking back toward the fence opening. He soon heard someone yelling for help. Mr. Howse proceeded toward the fence opening. Upon reaching it, he saw the victim and a black male fighting; the black male had the victim pushed up against the fence as if he were "on the ropes" in a boxing match.

For a few minutes, the fight did not involve a weapon. The victim was able to put the black male into a "deadlock" hold, however; at that point, the black male stabbed the victim several times. Mr. Howse tried to kick the black male off of the victim but, seeing blood and the knife, "tried to stay back." The knife was dirty, slightly tarnished, and had a pearl handle. Mr. Howse did not see a weapon in the victim's possession. The black male addressed Mr. Howse, and "was like, come on, he white, we black, we brothers, we supposed to stick together. And [Mr. Howse] was like, no, that ain't how it goes . . . get off of him."

When the black male refused to get off of the victim, Mr. Howse called 911. He heard the victim say, "he stabbed me, he's trying to rob me, get him – I'll pay you, get him off of me." He also saw the black male search the victim's two front pockets. The black male took something from one of the pockets, although Mr. Howse could not identify what it was. Noticing the police running toward the area, the black male ran away. Mr. Howse threw a brick at the black male, but missed.

Mr. Howse immediately returned to his residence, which he shared with his mother, aunt, siblings and three cousins. He did not speak to police that evening. Two days later, however, police located him through the 911 call he had made. Mr. Howse gave a recorded interview to the police and testified at the Defendant's preliminary hearing. He also looked

at a lineup of six pictures and picked the person he thought looked most like the black male in the fight; Mr. Howse could not positively identify the black male, however.

On cross-examination, Mr. Howse admitted that, two weeks before trial, he had told an Assistant Public Defender that he could not remember very much about the incident. Before trial, however, he listened to his recorded interview with police and his 911 call and read his preliminary hearing testimony. He also admitted that, in a previous statement, he had said that he was in the convenience store for longer than he had indicated in his testimony at trial. Further, he said that he could not be sure, contrary to a previous statement, which hand the Defendant used to rob the victim and which hand he used to stab him with the pocketknife.

Tamela Kelly, another University Court resident, testified that, on the evening of July 30, 2007, she witnessed the fight between the victim and a black male, across the street, while sitting on her porch. Ms. Kelly recognized the victim and said that he never bothered anyone in the area besides occasionally wanting to buy a cigarette.

Ms. Kelly walked onto her porch because her boyfriend at the time, Darnell Brown, told her a fight had begun. The fight lasted a long time. She did not see either of the participants use a knife. The fight was close to evenly matched, and Ms. Kelly opined that the victim seemed, at one point, to be winning. She saw a young male, apparently Mr. Howse, attempt to stop the fight, and saw the black male search the victim's pockets before running away. She did not see whether the black male took anything. Because the victim was yelling "help me," Ms. Kelly sent Mr. Brown to investigate. She learned from him that the victim was bleeding. She gave Mr. Brown a t-shirt and asked him to try to stop the victim's bleeding. Ms. Kelly did not see the black male's face.

Mr. Brown testified that he lived in University Court with Ms. Kelly on July 30, 2007. On that evening, he witnessed the beginning of the fight between the victim and the black male. First, he saw the victim walking toward University Court through the fence opening across the intersection of Carroll Street and First Avenue South. The black male then walked up behind the victim, held him around the neck, pulled him to the ground, and began to hit him. Mr. Brown walked over to the fight but, not seeing any weapons and believing the fight to be non-serious, chose not to intervene.

The fight lasted a total of about ten minutes, during which Mr. Brown saw a young male attempt to break up the fight. Eventually, Mr. Brown saw that the victim's pockets had been turned out, but he did not see whether the black male had taken anything. Mr. Brown never saw a knife, but eventually realized that the victim was bleeding. He applied a t-shirt to the wound in an attempt to help the victim.

Mr. Brown spoke to police after they arrived. Police took Mr. Brown to look at a suspect, the Defendant, sitting on a park bench three or four blocks away; Mr. Brown looked at him and said that he was not the black male who had fought with the victim. On cross-examination, Mr. Brown acknowledged that he had been convicted twice of selling less than .5 grams of cocaine.

Officer Eric Knight of the Metro Nashville Police Department ("MNPD") testified that he responded to a call about the fight at about 9:30 p.m. on July 30, 2007. Because he was in the University Court area at the time he received the call, it took him no more than fifteen seconds to reach the scene. When he arrived, he saw the victim laying on his back with his head propped up on a backpack. The victim appeared to have been stabbed in the chest. Officer Knight saw two other witnesses on the scene. The victim told Officer Knight that he could not respond to questions because he was trying to breathe.

MNPD Officer Thomas Spence testified that he came into contact with the Defendant on July 30, 2007, after the fight at issue had concluded. Officer Spence received a dispatch call noting that a passerby had sighted a possible suspect on a park bench at the intersection of Lafayette Street and Fourth Avenue South, about two blocks from the crime scene.

Upon arrival, Officer Spence saw the Defendant sitting on the indicated park bench wearing a black and green shirt and blue or faded black jeans. The Defendant was sweating heavily, and had fresh-looking abrasions, small cuts on his face, and a spot of blood on his shirt. Officer Spence asked the Defendant about these injuries; the Defendant responded that he had suffered them in a fight the day before. Another officer patted down the Defendant for weapons, but did not find any. The officer did not search the Defendant extensively enough to determine whether the Defendant had any money in his possession. The Defendant was cooperative and stayed on the park bench when officers left.

Officer Warren Fleak of the MNPD's Crime Scene Investigation Division ("CSID") processed the scene of the fight. The State introduced the diagram he produced, as well as a number of photographs of the scene and an inventory of items found in the area. He processed the knife, but found no blood on it. He did not process the recovered clothing. He later went to Vanderbilt University Medical Center ("VUMC") and recovered the victim's clothing. He found no usable fingerprints on this clothing or any of the other processed items.

Officer Charles Linville, also of the MNPD CSID, testified that, on July 31, 2007, he went to Southern Hills Hospital. He had received information that the Defendant was being treated at that location. Officer Linville photographed the Defendant's injuries and collected the Defendant's shirt; the State introduced the photographs at trial. He noted a number of

small abrasions and lacerations around both of the Defendant's eyes, the right side of his head, his left ear, and his stomach. MNPD Officer David Anderson had spoken to the Defendant early that morning; the Defendant told Officer Anderson that he had suffered his injuries when he fell near the fairgrounds.

Officer William Kirby of the MNPD's Identification Section testified that, on July 31, 2007, he was asked to go to the intersection of Second Avenue South and Interstate 40 to receive and process a pearl-handled pocketknife recovered in that area by Detective Robert Shotwell. The State introduced a diagram produced by Officer Kirby showing the knife's location, as well as a number of photographs. Officer Kirby noted that the blade of the pocketknife was bent such that the knife could not be closed. The knife did not have fingerprints on it. It did have blood on it; Officer Kirby took samples of the blood.

Clarence Pride, the State's next witness, testified that he was in custody for a drug charge-related probation violation at the time of the Defendant's trial. He had not been in custody at the time of the events underlying this case, however; at that time, he resided in and worked at Dave's Auto Repair near University Court. He testified that he had seen the victim around the area for about seven or eight months; he believed the victim to be homeless and saw him panhandling. He was also aware that the victim used crack cocaine.

Mr. Pride had known the Defendant by his street name, "Dre," for about ten or eleven years. On the evening of July 30, 2007, Mr. Pride saw the Defendant near the intersection of Lafayette Street and Interstate 40. At the time, Mr. Pride was drinking with a friend; they saw the Defendant walking towards them, looking as though he had been in a fight. The Defendant said he had been in a fight. Mr. Pride left the area to get help. When he returned, the Defendant and Mr. Pride's friend were gone.

The next day, the Defendant told Mr. Pride that the victim had died. At trial, Mr. Pride first said that the Defendant told him that he and the victim "got in an argument and then a fight broke out," but that the Defendant had not admitted to robbing the victim. After further questioning on direct examination, Mr. Pride admitted that, when he spoke a week beforehand to the assistant district attorney prosecuting the Defendant, he "probably" said that the Defendant had admitted to robbing the victim. At trial, however, Mr. Pride said that the Defendant merely claimed that he "was going to talk to [the victim] and see what was up with him" before the fight broke out.

When asked at trial whether he had been pressured since being in custody to protect the Defendant, Mr. Pride said, "A few words were said. That's about it." Finally, Mr. Pride admitted that he had, a week before, told the assistant district attorney prosecuting the Defendant that the Defendant had admitted he tried to rob the victim.

On cross-examination, Mr. Pride noted that he had been intoxicated on the evening of July 30, 2007, having consumed alcohol and used cocaine. He also admitted to having been convicted of selling less than .5 grams of crack cocaine in December 2007, forgery in an amount greater than $500 in February 2001, and criminal impersonation in July 2003 and May 2004.

Dr. Feng Li, Assistant Medical Examiner for Metro Nashville and Davidson County, was qualified as an expert in forensic pathology. He testified that he received the victim's body from VUMC and conducted an autopsy. The victim had a single major injury, a stab wound to the left-center of his chest, and a number of other smaller lacerations and abrasions. A major artery leaving the victim's heart had been pierced; it was a serious enough injury that immediate medical attention would have been required in order to save him. Dr. Li concluded that the manner of the victim's death was homicide and the cause of his death was a stab wound. Testing revealed that the victim had used cocaine within hours of his death.

MNPD Detective Robert Shotwell also testified. He arrived at the scene at about 11:00 p.m. on July 30, 2007. He spoke to Darnell Brown after Mr. Brown had negatively identified the Defendant on a nearby park bench; Det. Shotwell showed Mr. Brown a six-person photo lineup in an effort to determine the identity of the victim's attacker. Mr. Brown selected a picture of a man named Anthony Brownlow, who happened to be incarcerated at the time.

Early in the morning of July 31, 2007, Det. Shotwell interviewed the Defendant at Southern Hills Hospital. In Det. Shotwell's opinion, the Defendant was "higher than a kite," and said that a man named "Reg" had attacked him. Detective Shotwell arranged to have Officer Linville sent to the hospital to investigate the Defendant further.

Later that day, Det. Shotwell met David Kincherlow and took his statement. Mr. Kincherlow identified the Defendant as the victim's killer, estimating his certainty at seven out of ten. He also searched the crime scene in daylight and found a pearl-handled pocketknife about six inches long. He arranged to have Officer Kirby sent to the scene to process the knife.

Det. Shotwell then received information that police had stopped the Defendant near the intersection of Lafayette Street and Fourth Avenue South. Detective Shotwell went there. The Defendant was high again, although he noted that Reg, the man who he said attacked him, had used a brown Case-brand knife.

On August 1, 2007, Det. Shotwell met with Mr. Howse and showed him the same photo lineup Mr. Brown had viewed. Mr. Howse also selected the picture of the incarcerated Mr. Brownlow. The next day, Det. Shotwell located and interviewed Ms. Kelly.

On August 9, Det. Shotwell interviewed Mr. Pride, who told him that the Defendant had admitted to attempting to rob the victim and believed he had killed the victim. Later that day, Det. Shotwell again interviewed the Defendant. During the interview, Det. Shotwell and his partner told the Defendant that his fingerprints and DNA had been found on the recovered murder weapon and that witnesses had positively placed him at the crime scene. The Defendant admitted to being at the crime scene but said he did not rob or attempt to rob the victim.

The State introduced video and a transcript of the interview. In the interview, the Defendant says that the victim owed him thirty dollars and that he confronted the victim about the debt. A heated argument began. Eventually, the victim produced the pearl-handled pocketknife; the Defendant grabbed his arm in an effort to prevent the victim from stabbing him. The Defendant and the victim fell as they struggled, and the victim sustained his fatal stab wound.

Special Agent Forensic Scientist Chad Johnson of the Tennessee Bureau of Investigation testified that he tested a number of items to determine whether or not they contained the victim's or the Defendant's DNA. He found the victim's blood on swabs taken from the pearl-handled knife Det. Shotwell recovered near the crime scene. He found only the victim's blood and DNA on the victim's shirt, and only the Defendant's DNA on the Defendant's shirt.

Finally, the State presented the testimony of Ryan Caldwell, the attorney who had represented Mr. Pride on his March 2008 probation violation charge, and Amy Eisenbeck, the assistant district attorney who had prosecuted Mr. Pride for that charge. Both affirmed that Mr. Pride, who was sentenced to time served and released, made no deals in exchange for his testimony in the Defendant's case.

The Defendant presented the testimony of Byron Grizzle, the Director of the Records Management Program in the Davidson County Sheriff's Office. Mr. Grizzle testified that the Defendant had been in the Sheriff's Office's custody from July 23 to July 27, 2007, and that his inmate personal property receipt did not show that he possessed a knife.

MNPD Officer David Hacker testified that he patted down the Defendant at Lafayette Street and Fourth Avenue South on the evening of July 30, 2007, and found nothing but a crack pipe. On cross-examination, he noted that he was not specifically looking for money

and would not necessarily remember whether he had found any. He also affirmed that the Defendant had not told him, "there's a white boy hurt over there" or "a white boy tried to kill me." He said he did not search the Defendant's shoes or socks.

The Defendant was convicted of one count of voluntary manslaughter. He now appeals.

**Analysis**

**I. Batson Challenge**

The Defendant first contends that the trial court erred in denying his objection to the State's use of a number of peremptory challenges as race-based in violation of Batson v. Kentucky, 476 U.S. 79 (1986). The United States Supreme Court has articulated the process through which a party can show a violation of the Equal Protection Clause of the Fourteenth Amendment in an opposing party's use of peremptory challenges during jury selection. First, the challenging party must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94. To establish a prima facie case in the context of a peremptory challenge of a venire member, a defendant

> first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'

Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)).

> Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

Id. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors . . . related to the particular case to be tried." Batson, 476 U.S. at 97. The trial court must then decide whether the defendant has shown purposeful discrimination. Id.

When ruling on an alleged <u>Batson</u> violation, the trial court must articulate specific reasons for each finding on the record, "i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." <u>Woodson v. Porter Brown Limestone Co.</u>, 916 S.W.2d 896, 906 (Tenn. 1996). On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." <u>Id.</u>

Before trial, the State peremptorily challenged five African-American jurors; the Defendant objected to each challenge. The State said it challenged the first juror because she "gave hesitant and weak answers" when asked whether she would be swayed by the legal but dishonest tactics used by the police in this case to procure the Defendant's statement. The State said it challenged the second and third jurors because each had "some acquaintance or relative of theirs who had been either falsely accused or exonerated at trial." The State challenged the fourth juror because her brother had been convicted of murder seven years before, and challenged the fifth juror because he had been arrested eight times and once slammed against the hood of a car by police.

The trial court deemed each of these reasons sufficiently race-neutral. The Defendant argues on appeal that the totality of the peremptory challenges establishes a discriminatory purpose, in that the State used the majority of its challenges against African-Americans. Our review of the record, however, supports the existence of the State's claimed race-neutral explanations. We cannot conclude that the trial court's judgment was clearly erroneous. This issue is without merit.

## II. Sufficiency of the Evidence

The Defendant next contends that the State presented evidence insufficient to convict him of voluntary manslaughter and argues that he could be convicted, at most, of criminally negligent homicide. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. <u>See</u> <u>State v. Evans</u>, 108 S.W.3d 231, 237 (Tenn. 2003); <u>State v. Carruthers</u>, 35 S.W.3d 516, 557-58 (Tenn. 2000); <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>See</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>State v. Hall</u>, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. The Defendant solely argues that the evidence at trial was insufficient to show that he killed the victim intentionally or knowingly. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

The Defendant's own statement certainly is not sufficient to establish that he committed voluntary manslaughter, and we would agree with his argument on appeal but for the testimony of Mr. Brown, who testified that the Defendant initiated contact with the victim by violently grabbing him from behind, and Mr. Howse, who testified that he saw the Defendant wield the pearl-handled knife in a controlled manner and stab the victim several times. This testimony was sufficient to establish that the Defendant stabbed the victim non-accidentally with an awareness that the resulting stab wound to the chest would be reasonably certain to cause the victim's death. This issue is without merit.

### III. Closing Argument

The Defendant next contends that the trial court erred in overruling his objections to certain portions of the State's closing argument. During closing, the State attempted to bolster the credibility of Mr. Brown, Ms. Kelly, and Mr. Kincherlow by emphasizing that they had given previous statements to the police and that the Defendant had not impeached them using any prior inconsistency in those statements. The Defendant's failure to do so, the State argued, indicated that those prior statements were consistent with their trial testimony.

Within the closing argument, five general areas of prosecutorial misconduct are recognized:

(1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

See State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

During the State's closing argument, the Defendant only objected to the State's statement that "attorneys are allowed to cross[-]examine [witnesses] about their prior statements." The State then continued, noting that "we can't really play these other statements. And we can't really introduce police reports." The State further pointed out to the jury that "what you did not hear was prior inconsistent statements by Mr. Brown . . . [t]hat means he told the same thing that he told from the get-go." The State made similar statements about Ms. Kelly and Mr. Kincherlow.

At the time it provoked the Defendant's only objection, we conclude that the State had done nothing more than make a correct statement of the law. The Defendant did not object at trial to what we agree were improper statements of facts not in evidence, namely the contents of witnesses' prior statements. This issue is therefore waived. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). We will briefly address the merits of the Defendant's claim, however.

The established test for determining whether prosecutorial misconduct based on improper comments amounts to reversible error is whether the conduct was so improper or

the argument so inflammatory that it affected the verdict to the defendant's detriment. See Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Seay, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). In measuring the prejudicial impact of alleged prosecutorial misconduct, courts have been instructed to consider the following factors: (1) the conduct complained of viewed in the context of the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution in making the statement at issue; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also Goltz, 111 S.W.3d at 5-6.

We conclude that the State's argument did not affect the verdict to the Defendant's detriment. The Defendant asserts that his guilt or innocence of voluntary manslaughter was a "close question" at trial and that the State's objectionable statements tended to bolster certain witnesses' credibility by referring to facts not in evidence. Whether the Defendant was guilty of voluntary manslaughter rather than reckless homicide rested largely on the testimony of Mr. Howse, who was thoroughly impeached by prior inconsistent statements, rather than the testimony of Mr. Brown, Ms. Kelly, or Mr. Kincherlow. The facts and circumstances of the case favor the State in this context, as does the fact that the Defendant's failure to offer an additional objection deprived the trial court of an opportunity to take any curative measures. We have found no other errors in the record. Finally, in our view, the State presented a relatively strong voluntary manslaughter case against the Defendant. This issue is without merit.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's conviction.

_____
DAVID H. WELLES, JUDGE

-13-