*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————————

## UNITED STATES
Appellee

**v.**

## Willie C. JETER, Lieutenant Junior Grade
United States Navy, Appellant

**No. 22-0065**
Crim. App. No. 201700248

Argued October 12, 2022—Decided September 25, 2023

Military Judge: Heather Partridge (arraignment)
and Jason L. Jones (trial)

For Appellant: *Lieutenant Aidan J. Stark*, JAGC, USN (argued); *Major Anthony M. Grzincic*, USMC (on brief).

For Appellee: *Captain Tyler W. Blair*, USMC (argued); *Colonel Joseph M. Jennings*, USMC, *Lieutenant Gregory A. Rustico*, JAGC, USN, and *Brian K. Keller*, Esq. (on brief); *Lieutenant Colonel Christopher G. Blosser*, USMC, and *Lieutenant Commander Jeffrey S. Marden*, JAGC, USN.

Judge SPARKS delivered the opinion of the Court, in which Chief Judge OHLSON, Judge HARDY, and Senior Judge ERDMANN joined. Judge MAGGS filed a dissenting opinion.

———————————

Judge SPARKS delivered the opinion of the Court.[1]

In *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964), our predecessor Court stated that in the course of creating a venire panel, it is appropriate to add an African American servicemember to the panel specifically because of that servicemember's race. The Court stated that if such a step constitutes discrimination, "it is discrimination in favor of, not against, an accused." *Id.* at 41, 35 C.M.R. at 13. However, in *Batson v. Kentucky*, the Supreme Court held that "[a] person's race simply is unrelated to his fitness as a juror." 476 U.S. 79, 87 (1986) (citation omitted) (internal quotation marks omitted). Accordingly, we conclude today that our predecessor Court's holding in *Crawford* was abrogated by the Supreme Court's holding in *Batson*. In other words, *Crawford's* authorization— indeed, its encouragement—to use race when deciding who should be appointed to a court-martial venire panel is no longer good law.[2] As a result, whenever an accused makes a prima facie showing that race played a role in the panel selection process at his court-martial, a presumption will arise that the panel was not properly constituted. The government may then seek to rebut that presumption. Here, the Government did not meet its burden. Therefore, the decision below is reversed but a rehearing is authorized.

In 2017, contrary to his pleas, a panel of officer members sitting as a general court-marital convicted Lieutenant Junior Grade Willie C. Jeter (Appellant), an African American naval officer, of violating the Navy's

---

[1] The Court heard oral argument in this case at Naval Base San Diego, San Diego, California, as part of the Court's "Project Outreach." *See United States v. Mahoney*, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). Project Outreach is a public awareness program demonstrating the operation of a federal court of appeals and the military justice system.

[2] This conclusion is consistent with Article 25, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 825(d)(2) (2012), which makes no mention of race as one of the factors that may be considered in the panel selection process.

sexual harassment instruction, drunken operation of a vehicle, sexually assaulting two different women, extortion, burglary, conduct unbecoming an officer, communicating a threat, and unlawful entry, in violation of Articles 92, 111, 120, 127, 129, 133, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 911, 920, 927, 929, 933, 934 (2012).[3] The panel sentenced Appellant to twenty years confinement and a dismissal. The convening authority approved the sentence as adjudged. In relevant part, on appeal to the United States Navy-Marine Corps Court of Criminal Appeals, Appellant unsuccessfully challenged whether the exclusion of minority members from the court-martial panel violated his equal protection and due process rights. *United States v. Jeter*, 78 M.J. 754, 767 (N-M. Ct. Crim. App. 2019). The lower court affirmed the findings and sentence. *Id.* at 780. We vacated the judgment of the lower court and remanded for further consideration in light of *United States v. Bess*, 80 M.J. 1 (C.A.A.F. 2020). *United States v. Jeter*, 80 M.J. 200 (C.A.A.F. 2020) (summary disposition).

Upon remand, the convening authority, his acting convening authority, and his staff judge advocate (SJA) submitted affidavits to the lower court related to the member-selection process. *United States v. Jeter*, 81 M.J. 791, 797 (N-M. Ct. Crim. App. 2021). The lower court found that the convening authority did not violate Appellant's equal protection or due process rights and affirmed the findings and sentence. *Id.* at 794, 798, 800. We then granted review of the following issue:

> Did the convening authority violate Appellant's equal protection rights, over defense objection, when he convened an all-white panel using a racially nonneutral member selection process and provided no explanation for the monochromatic

---

[3] After the findings were announced, the military judge conditionally dismissed the sexual harassment specification, one of the two specifications of drunken operation of a vehicle, one of the three specifications of sexual assault, and one of the two specifications of unlawful entry.

result beyond a naked affirmation of good faith in
spite of a defense objection?

*United States v. Jeter*, 82 M.J. 355 (C.A.A.F. 2022) (order granting review). Following oral argument, we ordered additional briefing on the following specified issues:

> I.  In *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964), this Court held that in the course of panel selection a race conscious process is permissible for the purpose of inclusion. How does the *Crawford* decision affect the analysis of this case under *Avery v. Georgia*, 345 U.S. 559 (1953)?
>
> II. In light of Appellant's statement at oral argument that race is an improper consideration in detailing panel [members], should [this] Court overrule *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964)?

*United States v. Jeter*, 83 M.J. 77, 77 (C.A.A.F. 2022) (order granting review).

We hold that to the extent *Crawford* allows a convening authority to depart from the factors present in Article 25(d)(2), UCMJ, by seeking, even in good faith, to use race as a criterion for selection in order to make the members panel more representative of the accused's race, it has been abrogated by *Batson*, 476 U.S. 79.

## I. Background[4]

On January 4, 2017, the convening authority convened a general court-martial under General Court-Martial Convening Order 1-17 (GCMO 1-17), naming ten officers as members, of whom two were identified as African American men. *Jeter*, 81 M.J. at 797. On April 6, 2017, the acting convening authority amended this convening order (GCMO 1A-17), relieving all ten officers and naming eight new ones. The order was amended again four days later by the original convening authority, (GCMO 1B-17), who

---

[4] The facts underlying the offenses of which Appellant was convicted are not relevant to this appeal. That said, they are set forth in the first of the lower court's well-crafted opinions. *Jeter*, 78 M.J. at 762-64.

added one additional member. Seven of the nine members' questionnaires asked them to identify their race and sex. All seven members identified themselves as Caucasian males. The two other members' questionnaires did not contain a question regarding race or gender. Appellant's trial on the merits began on April 10, 2017.

Prior to voir dire, trial defense counsel challenged the makeup of the panel, citing a "systematic exclusion of members based on race and gender." The military judge noted that "[i]t appears that [the panel] is all white men" and that trial defense counsel's motion relied on the "bare makeup of the panel." The military judge found that there was no "evidence that there is an exclusion—a systematic, purposeful exclusion of any minority members or women or even rank, or you know position, staff or anything like that based on its face," and denied the motion.

Later during the trial, defense counsel again raised the objection to the makeup of the panel. In doing so, he provided a portion of a trial transcript from a separate court-martial, allegedly convened by the same convening authority, where the defense also raised concerns about the lack of minority representation on the panel. The military judge maintained his initial ruling, stating that there was "no evidence [the convening authority is] not using the Article 25 criteria; background, education, age, judicial temperament [when selecting members]."

## II. Discussion

We begin with the continuing reality that despite significant progress, sadly, racial prejudice persists in our society at large. However, we affirm an observation the Court of Military Appeals made some thirty-five years ago that, "In our American society, the Armed Services have been a leader in eradicating racial discrimination." *United States v. Santiago-Davila*, 26 M.J. 380, 390 (C.M.A. 1988). Nevertheless, we cannot blind ourselves to the fact that the military justice system, its member selection process in particular, remains vulnerable to actions by those who harbor outdated views regarding women and minorities.

Over the years, attempting to guard against this potential threat, this Court and the Court of Military Appeals have applied the Supreme Court's Fifth Amendment jurisprudence to the member selection process for courts-martial. "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019). Fifth Amendment equal protection includes the "right to be tried by a jury from which no 'cognizable racial group' has been excluded." *Santiago-Davila*, 26 M.J. at 390 (quoting *Batson*, 476 U.S. at 96). However, "[n]either in civilian courts nor in a court-martial does the Fifth Amendment guarantee an accused jurors or members who are of the same race." *Bess*, 80 M.J. at 7.

## A. *United States v. Crawford*

In *Crawford,* the accused, an African American soldier, was tried for alleged assaults against white soldiers. 15 C.M.A at 35, 35 C.M.R. at 7. Upon receiving the accused's request for enlisted members, the staff judge advocate asked the adjutant general to furnish a list of senior noncommissioned officers (NCOs) who were regarded as " 'responsible and available for court-martial duty.' " *Id*. at 50, 35 C.M.R. at 22 (Ferguson, J., dissenting). In view of the fact that the accused was African American, the SJA asked that the list include at least one African American enlisted man. *Id*., 35 C.M.R. at 22. The list was submitted with the African American members marked with an asterisk. *Id*., 35 C.M.R. at 22. Interestingly, the SJA testified that " 'while I thought it desirable that at least one of the enlisted members be [African American] . . . one of the officer members was [African American], and that a [African American] enlisted member was therefore not too important.' " *Id*., 35 C.M.R. at 22. When the list was submitted to the convening authority, he requested by name a particular African American NCO. *Id*., 35 C.M.R. at 22. When this individual was contacted, he vehemently protested that he was white and not African American. *Id*., 35 C.M.R. at 22. The adjutant general then suggested two other enlisted men believed to be African American. *Id*. at

36, 35 C.M.R. at 8. One turned out to be white and the other was rejected because two other members of his command were already on the list as nominees for the court-martial. *Id.*, 35 C.M.R. at 8. After further inquiry, the SJA succeeded in obtaining a " 'responsible' " African American enlisted member and he was added to the list. *Id.*, 35 C.M.R. at 8.

Regarding this aspect of the member selection process, the Court of Military Appeals struck a distinction between the purposeful exclusion of African American members and the intentional inclusion of African American members on a court-martial panel. It went on to hold, "If deliberately to include qualified persons is discrimination, it is discrimination in favor of, not against an accused. *Id.* at 41, 35 C.M.R. at 13.

## B. Abrogation of C*rawford*

Before assessing *Crawford*'s continuing vitality in the face of Supreme Court precedent to the contrary, we begin with a critical observation: Appellant contends correctly that *Crawford's* holding stating that deliberate selection of an African American member was proper inclusion to ensure fair representation is without a statutory basis pursuant to Article 25, UCMJ. This provision is a race-neutral statute delineating certain criteria convening authorities may consider when exercising their discretion to detail individuals who are "best qualified" to perform the duties as court-martial members.[5] Nowhere is the race of potential members or the race of the accused listed. Indeed, we have characterized the rule in *Crawford* as a "[departure] from the factors present in Article 25." *United States v. Riesbeck*, 77 M.J. 154, 163 (C.A.A.F. 2018); *see also United States v. Smith*, 27 M.J. 242, 248 (C.M.A. 1988) (a convening authority might use race, a criterion not

---

[5] "When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2), UCMJ.

specified in Article 25, UCMJ, to have a more representative panel). The language of Article 25, UCMJ, at the time of *Crawford* did not then, and does not now, include race as a factor to be considered by the convening authority. "[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statutes meaning . . . is finished." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992). "[T]he basic and unexceptional rule [is] that courts must give effect to the clear meaning of the statute as written." *Id.* at 476. Thus, Article 25, UCMJ, as written, does not support the holding in *Crawford* and to this day its holding remains unmoored from any statutory authority. To be clear, we do not mean to suggest that Article 25, UCMJ, presents an exhaustive list of the factors that may be considered. Other factors that are also not listed in Article 25, UCMJ, such as operational necessity or availability of prospective members, have long been recognized as valid considerations. But none of these factors have ever been expressly disavowed by the Supreme Court. We see no reason to question the continued viability of those factors that neither this Court nor the Supreme Court have ever prohibited.

Race in the context of jury selection has been singled out for special attention by the Supreme Court. *Batson* is a direct rejection of the *Crawford* holding. *Batson* affirmed what Judge Ferguson notably proclaimed some twenty-two years earlier in his dissent that "race is an impermissible criterion for selection of jurors." *Crawford*, 15 C.M.A. at 58, 35 C.M.R. at 30 (Ferguson, J., dissenting). "A person's race simply 'is unrelated to his fitness as a juror.'" *Batson*, 476 U.S. at 87 (citation omitted). Regarding the issue of race in the selection process, Justice Powell in *Batson* rejected outdated assumptions. As he succinctly put it, albeit in the context of the prohibition against the exclusion of African American veniremen, "[T]he Equal Protection Clause . . . forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black." *Id.* at 97. The statement is no less true as it pertains to the military

justice system when the convening authority is allowed to add some arbitrary number of African American members because they and the accused share the same race or ethnic group.

Therefore, our holding in *Crawford* is abrogated by the Supreme Court's holding in *Batson*.[6] In other words, *Crawford* is no longer good law. *See, e.g., United States v. Gomez*, 877 F.3d 76, 90 (2d Cir. 2017) (explaining a holding "must yield" when it "conflicts with" a Supreme Court decision). Abrogation of the *Crawford* holding allows a more fulsome embrace of the principle that race shall not be a criterion in the selection of court-martial members. It is impermissible to exclude or intentionally include prospective members based on their race.

### C. Racial Identifiers in Questionnaires

Against this backdrop we address Appellant's challenge regarding the racial identifier contained in the member questionnaires. At trial, the defense contended that the racial identifier on the questionnaire showed that the convening authority solicited race and considered it in selecting the members in this case. Through use of the questionnaires the convening authority had indeed solicited the race of prospective court-martial members. However, it had yet to be determined whether he had actually considered race in his selection of the members. Appellant's case was pending review before this Court when *Bess* was decided and was remanded to the lower court for reconsideration in light of that decision.[7] On remand, the court of criminal appeals found the evidence

---

[6] Our reference to *Batson* is intended to recognize the specific proposition from *Batson* that "[a] person's race simply is unrelated to his fitness as a juror." 476 U.S. at 87 (citation omitted) (internal quotation marks omitted).

[7] In *Bess*, 80 M.J. at 10, we held that the alleged absence of African American members on a general court-martial panel did not establish a prima facie case of exclusion based on race, as the convening authority's actions were entitled to a presumption of regularity.

presented to it on remand "sufficient to question the presumption of regularity of the convening authorities' member selection." *Jeter*, 81 M.J. at 795. Consequently, the court ordered affidavits from the convening authorities and the SJA. *Id.* The two convening authorities could remember little about the selection process in this case other than to say that they may have been aware of the race of some of the prospective members but that neither *recalled* considering race as a criterion for selection. The SJA's affidavit described the general process for selecting prospective court-martial members. Regarding the original convening order in this case (GCMO 1-17), he indicated that these members would have been drawn from "our available pool of member questionnaires." The essence of his declaration was that he "[did] not recall the convening authority in any case to ever have been aware of or discussed the race of any member of any court-martial." Therefore, on remand the information available to the lower court was as follows: the names for the original convening order, as well as its two amendments, which were drawn from an "available pool of member questionnaires"; the questionnaires in this case contained racial identifiers; two African American members on the original convening order were subsequently removed pursuant to the first amendment to the convening order; and three other courts-martial with African American accuseds were convened by this convening authority before all-white panel members.

We have previously addressed racial identifiers. *See United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994) ("We will not presume improper motives from inclusion of racial . . . identifiers on lists of nominees for court-martial duty"). "[A] convening authority is not required to be race-ignorant; he or she is only required to be race-neutral." *United States v. Green*, 37 M.J. 380, 384 (C.M.A. 1993). Although racial identifiers are neutral, they are capable of being used for proper as well as improper reasons. *Loving*, 41 M.J. at 385. In this context, we are reminded of Chief Justice Vinson's caution against a "practice [that] makes it

easier for those to discriminate who are of a mind to discriminate." *Avery v. Georgia,* 345 U.S. 559, 562 (1953). Consequently, the principles espoused in *Batson* inform our view that we must carefully examine member selection practices to protect the military accused from procedures that may operate to exclude persons on racial grounds, regardless of the race of the accused. *See Batson,* 476 U.S. at 88. Just as in the civilian context, a convening authority may not draw up a members panel pursuant to the neutral criteria of Article 25, UCMJ, only to have discriminated at other stages of the process. *See id*. Here, Appellant made a prima facie showing that gives rise to a presumption that race was allowed to enter the selection process. The circumstances include the racial identifier in the questionnaires, other evidence before the court of criminal appeals, and importantly, the command's understandable belief that the *Crawford* case—which not only authorized but essentially encouraged the consideration of race—was still good law.

We need not impugn the integrity or credibility of the affiants' statements to the lower court. After all, the affidavits were submitted some four years after the court-martial. It is, therefore, not surprising that their memories regarding the selection process in this case were less than clear. Here, however, the appellate record does not address this "available pool of members questionnaires" alluded to in the affidavits. The use of a race-conscious component in the selection process combined with the absence of any evidence in the record addressing how and by whom selection was made from this pool of members leaves us to seriously question whether the impermissible criterion of race might have found its way into the selection process— possibly even before the convening authorities made their selections. Although the Government obtained affidavits from the SJA, the convening authority, and the acting convening authority regarding this matter, for all intents and purposes those affidavits simply reflected that they could not recall how the venire panel was chosen. Thus, we are left with an unrebutted inference that Appellant's

constitutional right to equal protection under the law was violated when the acting convening authority presumptively used a race-conscious selection process for panel members. Under these facts, we reverse. *See Weaver v. Massachusetts*, 582 U.S. 286, 301 (2017) (granting "automatic relief to defendants who prevailed on claims alleging race . . . discrimination in the selection of the petit jury"); *Batson*, 476 U.S. at 100 ("If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed.").

As a final matter, much of the information concerning the selection process in this case came to light during its lengthy appellate review. True, the trial defense team was presented the opportunity to pursue more evidence to support its claim of purposeful exclusion but chose not to avail themselves of this opportunity. To be fair, however, neither the trial participants nor the lower court could have anticipated our conclusion that *Crawford* is abrogated, thereby changing the legal landscape. Going forward, it is our hope that trial participants will understand that many of the questions that arose in this case might have been resolved through detailed discovery requests and generous government responses to such requests.

### III. Conclusion

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Judge MAGGS, dissenting.

Everyone involved in this case—Appellant, the Government, the military judge, the judges of the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA), and all the judges of this Court—agrees on a fundamental point: A convening authority may not discriminate on the basis of race when detailing members to serve on a court-martial. Such discrimination would not only be unauthorized by Article 25, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 825 (2018), but would also violate the Due Process Clause of the Fifth Amendment of the United States Constitution. I fully concur with the majority opinion's thorough discussion of this basic principle.

But whether a convening authority may discriminate on the basis of race is not specifically at issue in this appeal. The precise question at issue is whether Appellant has shown, either by affirmative evidence in the record or through unrebutted evidentiary presumptions, that racial discrimination occurred in this case. For the reasons explained below, I agree with both the NMCCA and the military judge that Appellant has not established that the convening authority acted improperly. I therefore respectfully dissent from the Court's judgment setting aside the findings and sentence in this case.

Before turning to my analysis, a preliminary point requires attention. The Court's opinion focuses almost exclusively on the two specified issues for which this Court ordered additional briefing.[1] Addressing these issues, the Court concludes that *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964), conflicts with subsequent decisions of the United States Supreme Court and is therefore no longer good law. I fully agree with the Court. *Crawford* was

---

[1] Specified Issue I is: "In *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964), this Court held that in the course of panel selection a race-conscious process is permissible for the purpose of inclusion. How does the *Crawford* decision affect the analysis of this case under *Avery v. Georgia*, 345 U.S. 559 (1953)?" Specified Issue II is: "In light of Appellant's statement at oral argument that race is an improper consideration in detailing panel members, should this Court overrule *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964)?"

incorrect when it was decided, and subsequent decisions of the Supreme Court have eliminated any weight it carried as precedent. But in my view, the invalidity of *Crawford* does not affect the outcome of this case. The NMCCA did not cite or rely on *Crawford* in rejecting Appellant's claims. *United States v. Jeter*, 81 M.J. 791 (N-M. Ct. Crim. App. 2021). The Government also does not rely on *Crawford* in defending the NMCCA's judgment and specifically asserts that the holding in *Crawford* is not directly implicated. And for the reasons explained below, reference to *Crawford* is unnecessary to resolve this appeal. Thus, while I agree with the Court about *Crawford*, I reach a different conclusion about whether we should affirm the NMCCA.

## I. Appellant's Arguments

In his well-organized briefs, Appellant presents three distinct arguments for relief. These arguments rest on separate doctrines established by precedents of the United States Supreme Court. In my view, however, Appellant does not prevail under these precedents.

### A. Appellant's Argument Based on *Avery* and *Alexander*

Appellant's first argument relies on the Supreme Court's decisions in *Avery v. Georgia*, 345 U.S. 559 (1953), and *Alexander v. Louisiana*, 405 U.S. 625 (1972). In *Avery*, a jury in a Georgia state court found an African American criminal defendant guilty of rape. 345 U.S. at 560. The defendant sought to overturn his conviction based on racial discrimination in the selection of the jurors. *Id.* at 560-62. The record showed that the names of persons eligible for jury service had been written on color-coded tickets and placed in a box. *Id.* at 560-61. A judge then selected the venire by drawing sixty tickets from the box. *Id.* The selection process was not race-neutral because "the names of white persons . . . [were] printed on white tickets; the names of Negroes [were] printed on yellow tickets." *Id.* at 560. The use of separately colored tickets had "no authorization in the Georgia statutes." *Id.* at 562. Indeed, there was testimony from a "member of the county Board of Jury Commissioners that the use of these white and

yellow slips was designed for purposes of racial discrimination, and it [was not] shown that they could serve any other purpose." *Id.* at 564 (Frankfurter, J., concurring). The judge who selected the jurors could see the colors of the tickets through an aperture in the box. *Id.* Although five percent of the tickets were yellow, the judge did not select any of them for the venire from which the jury was chosen. *Id.* at 563 (Reed, J., concurring). Accordingly, the jury in the case did not include any African Americans. *Id.* at 561 (opinion of the Court). Based on these facts, the United States Supreme Court agreed with the Georgia Supreme Court that the defendant in *Avery* had "certainly established a prima facie case of discrimination." *Id.* at 562.

The Court in *Avery* then considered whether the state had rebutted the prima facie case. A key fact was that the judge who selected the tickets had testified that "he did not, nor had he ever, practiced discrimination in any way, in the discharge of that duty." *Id.* at 561. The Georgia Supreme Court had held that the judge's testimony showed that the use of the colored tickets had caused no harm. *Avery v. State*, 70 S.E.2d 716, 722 (Ga. 1952). But the U.S. Supreme Court rejected this conclusion, stating that "based upon [its] independent analysis of the record [the] petitioner has made a sufficient showing of discrimination in the organization of this particular panel." *Avery*, 345 U.S. at 561 (footnote omitted). Justice Frankfurter concurred, explaining: "The mind of justice, not merely its eyes, would have to be blind to attribute" the absence of African Americans on the jury "to mere fortuity" as opposed to intentional discrimination. *Id.* at 564 (Frankfurter, J., concurring).

In *Alexander*, a Louisiana state court convicted an African American defendant of rape. 405 U.S. at 626. On appeal, the defendant argued that his indictment was invalid because of racial discrimination in the selection of the members of the grand jury. *Id.* at 626-28. The record showed that a commission had selected grand jurors through a multistep process that began by asking local

3

residents to fill out a questionnaire. *Id.* at 627-28. The Supreme Court explained:

> The questionnaire included a space to indicate the race of the recipient. Through this process, 7,374 questionnaires were returned, 1,015 of which (13.76%) were from Negroes, and the jury commissioners attached to each questionnaire an information card designating, among other things, the race of the person, and a white slip indicating simply the name and address of the person. The commissioners then culled out about 5,000 questionnaires, ostensibly on the ground that these persons were not qualified for grand jury service or were exempted under state law. The remaining 2,000 sets of papers were placed on a table, and the papers of 400 persons were selected, purportedly at random, and placed in a box from which the grand jury panels of 20 for Lafayette Parish were drawn. Twenty-seven of the persons thus selected were Negro (6.75%). On petitioner's grand jury venire, one of the 20 persons drawn was Negro (5%), but none of the 12 persons on the grand jury that indicted him, drawn from this 20, was Negro.

*Id.* at 627-28 (footnotes omitted).

Following its earlier decision in *Avery*, the Supreme Court held that the defendant in *Alexander* had established a prima facie case of discrimination. *Id.* at 631. The Court explained:

> This Court has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors. The progressive decimation of potential Negro grand jurors is indeed striking here, but we do not rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves were not racially neutral. The racial designation on both the questionnaire and the information

>  card provided a clear and easy opportunity for ra-
>  cial discrimination.

*Id.* at 630. The Supreme Court next considered whether the
state had rebutted this prima facie case of racial discrimi-
nation "by showing that permissible racially neutral selec-
tion criteria and procedures have produced the monochro-
matic result." *Id.* at 632. The Court concluded that the
state had not met its burden. *Id.* Although a member of the
commission had testified "that no consideration was given
to race during the selection procedure," the Supreme Court
found this statement inadequate to rebut the prima facie
case because the " 'result bespeaks discrimination, whether
or not it was a conscious decision on the part of any indi-
vidual jury commissioner.' " *Id.* (quoting *Hernandez v.
Texas*, 347 U.S. 475, 482 (1954)).

Appellant argues that the *Avery* and *Alexander* deci-
sions require reversal of the NMCCA. He asserts that he
has established a prima facie case of discrimination be-
cause (1) all of the members of his court-martial were
white, (2) the selection process was not race-neutral given
that some members under consideration for detail to the
court-martial had completed questionnaires that asked
about their race, (3) the convening authority chose the
members of the panel based on the information in the ques-
tionnaires, and (4) the members were chosen from a large
population of available persons. Appellant further argues
that the Government has not rebutted the prima facie case
because the convening authority and acting convening au-
thority failed to explain why they did not select any African
Americans to serve on the panel.

Although trial defense counsel challenged the makeup
of the panel before the military judge, he did not cite *Avery*
or *Alexander*, nor did he raise the specific argument that
he now makes before this Court. Trial defense counsel ini-
tially alleged "systematic exclusion of members based on
race" solely because the panel included no minority mem-
bers even though the convening authority had the "oppor-
tunity to put a minority representation on the panel." He
did not allege or provide any evidence that the convening

authority had abused the selection system. On the contrary, trial defense counsel asserted that "all we have is the makeup to go on, sir, but we believe that that is sufficient without the allegation raised up." Later on at the trial, defense counsel presented distinct arguments based on an alleged pattern of all-white panels in the Norfolk region. In his briefs before the NMCCA, Appellant also did not cite *Avery* or *Alexander*.

Accordingly, in my view, Appellant forfeited the argument based on *Avery* and *Alexander* that he now makes before this Court. *See United States v. King*, 83 M.J. 115, 120 (C.A.A.F. 2023) (arguments concerning court-martial composition that are not raised at trial are forfeited). Because Appellant forfeited the issue, we may review it only for plain error.[2] *Id.* at 120-21. Under the plain error standard of review, the appellant ordinarily " 'bears the burden of establishing: (1) there is error; (2) the error is clear or obvious; and (3) the error materially prejudiced a substantial right.' " *Id.* at 123 (quoting *United States v. Robinson*, 77 M.J. 294, 299 (C.A.A.F. 2018)). But when the error alleged is a constitutional error, as here, this Court has held that the government bears the burden on the issue of prejudice and must prove that the error was harmless beyond a reasonable doubt. *United States v. Tovarchavez*, 78 M.J. 458, 462 (C.A.A.F. 2019).

Applying the plain error standard of review, I conclude that Appellant is not entitled to relief because any error under *Avery* and *Alexander* was not clear and obvious. I reach this conclusion for two reasons. First, the facts of this case are markedly different from the facts of *Avery* and

---

[2] This Court has considered some arguments not raised before a Court of Criminal Appeals, but the practice has been criticized. *See United States v. Johnson*, 42 M.J. 443, 448 (C.A.A.F. 1995) (Crawford, J., concurring in the result) ("If an issue is not raised by counsel, not specified and not addressed in an opinion, waiver should apply absent a showing of good cause for failing to raise the issue or manifest injustice."); *cf. Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005) ("[W]e are a court of review, not of first view.").

*Alexander*. In *Avery*, state officials used white and yellow tickets to identify potential jurors, without legal authorization, specifically so they could discriminate against African Americans. 345 U.S. at 560-62. In addition, a review of the entire record left the Court unconvinced by the state judge's utterly implausible assertion that he had not used the colored tickets to discriminate notwithstanding the all-white jury that he selected. *Id.*

By contrast, in this case, agents of the command cited Rule for Courts-Martial (R.C.M.) 912 in their questionnaires as authority for asking potential members about their race.[3] The record contains no testimony suggesting the selection process "was designed for purposes of racial discrimination," as in *Avery*. 345 U.S. at 564 (Frankfurter, J., concurring). Nor are the questionnaires clearly and obviously comparable to *Avery*'s white and yellow tickets. The questionnaires asked each prospective member over fifty questions about a wide range of information, while the tickets reduced each prospective juror to two characteristics: their name and race. *Id.* at 560.

In *Alexander*, the Supreme Court focused on evidence of a multistep process that systematically removed African Americans from a pool of grand jurors at every step and produced a highly improbable result. 405 U.S. at 627-28. The record does not establish that anything of the kind occurred in this case. *See id.* at 630 (explaining that the Supreme Court's conclusion did "not rest . . . on statistical improbability alone").

Second, any error under *Avery* and *Alexander* is not clear and obvious given this Court's decision in *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994). In *Loving*, the appellant objected to "inclusion of racial and

---

[3] R.C.M. 912(a) lists information about which *trial counsel* and *trial defense counsel* may ask the members before trial. R.C.M. 912(a)(1)(C) includes "Race." Appellant also cites this rule as possible authority for the convening authority to include a question about race in the questionnaire given to potential panel members.

gender identifiers on the lists of nominees" for service on courts-martial. *Id.* This Court held that "[w]e will not presume improper motives from inclusion of racial . . . identifiers on lists of nominees for court-martial duty." *Id.* In the light of this precedent, soliciting the racial identity of the potential members was not so clearly and obviously contrary to *Avery* and *Alexander* that the military judge should have acted on it even though trial defense counsel did not raise the argument.

In concluding that Appellant has failed to show that any error was clear and obvious, I do not rely in any way on *Crawford*. In that case, the Court held that the convening authority did not act improperly even though he specifically selected a court member based on his race. 15 C.M.A. at 41, 35 C.M.R. at 13 (opinion of Quinn, J.); *id.* at 49, 35 C.M.R. at 21 (Kilday, J., concurring in the result). Today the Court concludes that *Crawford* is no longer good law. Again, I agree with that decision. But rejecting *Crawford* makes no difference to my analysis or my conclusion in the present case that any error under *Avery* and *Alexander* was not plain and obvious.

B. Appellant's Argument Based on *Batson*

Appellant next argues that this Court should evaluate the convening authority's selection of members under the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986). In *Batson*, the Supreme Court held that a criminal defendant "may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96. Specifically, a defendant can make a prima facie case by showing that (1) "he is a member of a cognizable racial group," (2) "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race," and (3) "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* Once the defendant establishes a prima facie case, the burden shifts to the prosecution to establish

that the peremptory challenge was not exercised for a racially discriminatory purpose. *Id.* at 97. The keystone of *Batson* was the Supreme Court's holding that a "defendant is entitled to rely on the fact . . . that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Id.* at 96 (quoting *Avery*, 345 U.S. at 562).

Appellant bases his *Batson* argument on Judge Cox's observation that in selecting the members of a court-martial, the convening authority "has the functional equivalent of an unlimited number of peremptory challenges." *United States v. Carter*, 25 M.J. 471, 478 (C.M.A. 1988) (Cox, J., concurring). The idea is that while the trial counsel has only one peremptory challenge in the courtroom to exclude a panel member, R.C.M. 912(g)(1), the convening authority can effectively exclude an unlimited number of servicemembers when issuing a court-martial convening order by simply not detailing them. Appellant argues that the convening authority's alleged unlimited peremptory strikes resulted in an all-white court-martial, which establishes a prima facie case of discrimination under *Batson* that the Government failed to rebut. I will assume that Appellant preserved this argument because trial defense counsel specifically—although vaguely—mentioned peremptory challenges in connection with his objection to the selection of the members before the military judge, and he asked the military judge to order the convening authority to provide a race-neutral justification. Appellant also specifically cited *Batson* and made a similar argument before the NMCCA.

In *United States v. Bess*, 80 M.J. 1 (2020), this Court heard essentially the same *Batson* argument that Appellant now makes. The Court in *Bess*, however, did not produce a majority opinion on the issue. Two of the three judges who agreed with the judgment in *Bess* rejected the *Batson* argument, explaining that requiring a convening authority to provide a race-neutral justification for not including certain persons on a court-martial would be an unauthorized extension of the *Batson* decision. *Id.* at 8-9

(opinion of Ryan, J., joined by Stucky, C.J.). These judges saw no "precedent that would require extending *Batson*'s holding outside the context of peremptory challenges" and noted that "the only extensions of *Batson* [by the Supreme Court] have been within the peremptory strike context itself." *Id.*; *see also United States v. Gooch*, 69 M.J. 353, 359 (C.A.A.F. 2011) (distinguishing *Batson* because, unlike in *Batson*, there was no evidence of an "improper motive to pack the member pool or to exclude members based on race" (internal quotation marks omitted)). As the only other judge who concurred in the judgment in *Bess*, I did not reach the *Batson* issue. In my view, addressing the issue on the merits was unnecessary in *Bess* because the record did not establish a key predicate for the appellant's claim, namely, that all members of the panel were white. 80 M.J. at 14-15 (Maggs, J., concurring in part and concurring in the judgment).

The record in this case differs from the record in *Bess*. In *Bess*, the "military judge made no finding as to the members' races," explained that "she was uncertain of their races based on their appearances," and "refused to infer their races based on stereotypes." *Id.* at 15 n.1. In contrast, in this case, the military judge stated on the record: "Without asking people directly what do [they] consider their race . . . . [i]t appears that they [are] all white men." While some military judges might not have made findings about race solely based on appearance, neither party has challenged the military judge's conclusion in this case as clearly erroneous. I therefore will assume that Appellant has established this factual predicate for his *Batson* argument.

Reaching the *Batson* issue now, I agree with Judge Ryan's reasoning in *Bess*. In *Batson*, the Supreme Court created a burden-shifting rule that applies to the specific context of peremptory challenges. The Supreme Court's opinion in *Batson* reveals that this burden-shifting rule is an application of *Avery* and *Alexander* to allegations of discrimination in the courtroom. 476 U.S. at 96-97. For challenges alleging discrimination outside of the courtroom, such as an allegation of discrimination by a convening

authority in detailing members to a court-martial, the general rules of *Avery* and *Alexander*—not *Batson*—are the proper framework.

Indeed, the Supreme Court has not extended *Batson* beyond peremptory challenges. Moreover, other federal courts have expressly declined to extend *Batson* to closely related contexts. *See, e.g., United States v. Elliott*, 89 F.3d 1360, 1364-1365 (8th Cir. 1996) (rejecting the application of *Batson* to for-cause challenges); *United States v. Blackman,* 66 F.3d 1572, 1575 n.3 (11th Cir. 1995) (same). Accordingly, while neither Judge Cox nor Appellant is wrong to observe that the court-martial detailing process is somewhat similar to peremptory challenges, I still see no authority for this Court to extend *Batson* to a convening authority's selection of panel members.

The Court reaches a contrary holding, concluding with little discussion that *Batson* does apply to a convening authority's selection of panel members. The Court further concludes that Appellant has made a prima facie showing under *Batson*. But even assuming arguendo that *Batson* applies to a convening authority's detailing decisions because they are similar to peremptory challenges, I would conclude that the military judge still did not err in denying Appellant's motion challenging the panel. As explained above, the Supreme Court in *Batson* instructed that before finding a prima facie case of discrimination, a court must consider not only the race of the accused and the use of a peremptory challenge to excuse a member of the same race but also whether "any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." 476 U.S. at 96. The consensus of the federal United States Courts of Appeals is that this is a "fact-sensitive" question that "should be reviewed under the familiar clear-error standard." *United States v. Bergodere*, 40 F.3d 512,

516 (1st Cir. 1994).[4] This Court has followed the same approach, applying the clear error standard to evaluate allegations that a convening authority discriminated based on race when selecting members of a court-martial. *Gooch*, 69 M.J. at 359.

In this case, after hearing arguments from trial counsel and defense counsel, the military judge asked trial defense counsel if Appellant had any evidence "other than just the bare makeup of the panel." Trial defense counsel replied, "No, sir. That's all we have." The military judge then noted that Appellant's only evidence was "the fact that [the panel was] all white men," and explained that Appellant could still "put[] on evidence or call[] witnesses." Trial defense counsel responded by stating that Appellant would "stand on [his] motion as it is."

The military judge then denied Appellant's motion with an oral ruling:

> The Court is not going to disqualify this entire panel without ever attempting to seat them. At this time the Article 25 criteria—age, education, training, experience, background, judicial temperament—those types of issues are not what's supposed to be attacked here. The attack here is the

---

[4] *See United States v. Casper*, 956 F.2d 416, 418 (3d Cir. 1992); *United States v. Grandison*, 885 F.2d 143, 146 (4th Cir. 1989); *United States v. Branch*, 989 F.2d 752, 755 (5th Cir. 1993); *United States v. Hall*, 20 F.4th 1085, 1097 (6th Cir. 2022); *United States v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990); *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994); *United States v. Hill*, 643 F.3d 807, 837-38 (11th Cir. 2011); *see also Hernandez v. New York*, 500 U.S. 352, 369 (1991) (plurality opinion) ("[W]e decline to overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous"); *id.* at 372 (O'Conner, J., joined by Scalia, J., concurring in the judgment) ("I agree with the plurality that we review for clear error the trial court's finding as to discriminatory intent"); *but see United States v. Jordan*, 223 F.3d 676, 686 (7th Cir. 2000) (explaining that a de novo standard of review applies to review of whether the defendant has made a prima facie case under *Batson*).

> gender and ethnic makeup of this panel based
> upon the accused being an African-American
> male; the panel lacks the diversity of anything
> else other than white men. So without more, . . .
> the court just doesn't have in front of it the evi-
> dence to attack . . . each member individually or
> their selection in general. . . . [I]f the defense
> wants to attack it later maybe based upon what
> individuals say how they got here . . . . I will open
> it back up . . . but right now I don't see . . . based
> on just the bare allegation alone, the convening
> authority acting in a manner to purposely exclude
> women or minorities.

(Transcript punctuation edited for clarity.) The military judge ultimately found that the defense had "provided nothing in the way of either direct or circumstantial proof to buttress the naked statistic on which he relie[d]." *Bergodere*, 40 F.3d at 516. Nothing in the record shows that the military judge's finding was clearly erroneous. Appellant therefore did not make the showing necessary to establish a prima facie case under *Batson*.

### C. Appellant's Argument Based on *Castaneda*

Appellant's final argument is that he has established a prima facie case of racial discrimination by the convening authority under the Supreme Court's decision in *Castaneda v. Partida*, 430 U.S. 482 (1977). In *Castaneda*, the Supreme Court announced a three-step test for evaluating claims alleging that a process for selecting jurors or grand jurors systematically excludes minorities. *Id.* at 494-95. The Supreme Court stated:

> The first step is to establish that the group is one
> that is a recognizable, distinct class, singled out
> for different treatment under the laws, as written
> or as applied. Next, the degree of underrepresen-
> tation must be proved, by comparing the propor-
> tion of the group in the total population to the pro-
> portion called to serve as grand jurors, over a
> significant period of time. . . . Finally, . . . a selec-
> tion procedure that is susceptible of abuse or is not
> racially neutral supports the presumption of dis-
> crimination raised by the statistical showing.

*Id.* (citations omitted). Appellant contends that he has satisfied this test because several recent general courts-martial in the Navy at Norfolk have had no African American members.[5] Appellant preserved this argument, in my view, by arguing to the military judge that there had been a "pattern" of all-white panels. He also specifically relied on *Castaneda* in his briefs before the NMCCA.

In *Bess*, however, this Court rejected an almost identical claim. Assuming, without deciding, that the *Castaneda* test applies to the selection of members of a court-martial, the Court reasoned that the appellant in *Bess* had not produced statistical evidence covering a "significant period" as the Supreme Court's test requires. *Bess*, 80 M.J. at 9-10 (citation omitted) (internal quotation marks omitted). The present case is not materially different from *Bess*. Appellant has cited a few recent cases but has not identified evidence of disproportionate representation over a significant period. Following *Bess*, I therefore conclude that Appellant also has failed to make a prima facie case of purposeful discrimination under *Castaneda*.

Appellant argues that this Court should reconsider the assumption in *Bess* that *Castaneda* applies the same way in the military as it does in civilian contexts. He asserts that "the unique nature of convening authorities' relatively short periods of tenure should prompt a departure from such an extensive time requirement." But Appellant cites nothing that would require this Court to apply *Castaneda* and in so doing to alter the *Castaneda* test.

## II. The Court's Discussion of Article 25, UCMJ

In addition to holding that Appellant has shown a prima facie violation of the Constitution, the Court also

---

[5] Appellant has cited what he considers "four courts-martial of an African-American accused in which the same Convening Authority hand-selected all-white panels." I do not necessarily agree with his characterization of these cases. For example, one of the cases that Appellant cites is *Bess*, and in that case as explained above, the military judge did not make a finding regarding the races of the panel members.

addresses Article 25, UCMJ. The Court asserts that Article 25, UCMJ, does not permit a convening authority to use race as a criterion for selecting panel members. I fully agree with this statement. But in my view, Appellant is not entitled to relief for a violation of Article 25, UCMJ, because the record does not establish either a clear error by the military judge or prejudice to Appellant.

When Appellant raised a challenge under Article 25, UCMJ, at trial, the military judge rejected it as unsupported by the facts. This Court reviews a military judge's findings of fact regarding challenges to member selection under Article 25, UCMJ, for clear error. *United States v. Riesbeck*, 77 M.J. 154, 165 (C.A.A.F. 2018); *Gooch*, 69 M.J. at 358-59. With respect to Appellant's Article 25, UCMJ, challenge, the military judge specifically ruled:

> I don't see any improper selection using the Article 25 criteria. . . .
>
> . . . .
>
> . . . I'm going to stick by my initial ruling that I don't see any unlawful Article 25 issue here, but . . . there is no evidence they are not using the Article 25 criteria[:] background, education, age, judicial temperament. Knowing the courts have routinely said that you can use demographic[s] to include . . . people, minorities, women, people like that . . . . And that is not impermissible—
>
> . . . .
>
> . . . But in this case, I still don't see the systemic exclusion of those people. I see and understand your point and it's noted for the record.

The military judge thus found that the convening authority had not deviated from the Article 25, UCMJ, criteria and did not impermissibly exclude minorities. These findings are not clearly erroneous, and accordingly, I see no basis for finding an error under Article 25, UCMJ.

In addition, I note that reaching a different conclusion would violate the principle that "without contrary indication, 'the presumption of regularity requires us to presume

that [the convening authority] carried out the duties imposed upon him by the Code and the Manual.'" *Bess*, 80 M.J. at 10 (quoting *United States v. Wise*, 6 C.M.A. 472, 478, 20 C.M.R. 188, 194 (1955)). Because I see no "contrary indication," I believe that the presumption of regularity applies in this case.

Finally, even assuming that an error occurred under Article 25, UCMJ, Appellant has not established prejudice. An error under Article 25, UCMJ, is a statutory error. The test for prejudice for a "nonconstitutional error in the application of Article 25, UCMJ," is whether the error "'materially prejudiced the substantial rights of the accused.'" *Gooch*, 69 M.J. at 360 (quoting Article 59(a), UCMJ). Appellant has not provided any grounds for concluding that the panel that tried him was not "fair and impartial." *Id.* at 361. Accordingly, I would hold that Appellant has not carried his burden of showing that any error in soliciting the racial identity of potential panel members, without more, caused material prejudice to his substantial rights.

### III. Conclusion

For the foregoing reasons, I would affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals.